PETER ZINK, Plaintiff in Error, v. THE PEOPLE OF THE STATE OF NEW YORK, Defendant in Error.

Where A. ships his goods to B. to be sold, and gives to the latter for that purpose the *indicia* of ownership, under an arrangement that B. shall advance and pay the freight, sell the goods, and account for the proceeds, deducting the freight; and B. sells the goods and converts the proceeds, he cannot be convicted of larceny of the goods; and this, although A. was induced to enter into the arrangement by false representations on the part of B., made in pursuance of a previous design on his part to obtain the goods, and to cheat A. out of them, or the proceeds thereof.

*It seems*, that the offence in such case is the obtaining of the property under false pretences.

The distinction between larceny and false pretences is, that in the former the owner of the goods has no intention to part with his property therein, while in the latter the owner does intend to part with his property, which intention is the result of fraudulent contrivances.

*Zink* v. *People* (16 Hun, 396), reversed.

*Smith* v. *People* (53 N. Y., 111); *Loomis* v. *People* (67 *id*, 322); *Hilderbrand* v. *People* (1 Hun, 19); *Weyman* v. *People* (4 id., 511), distinguished.

(Argued March 20, 1879; decided April 22, 1879.)

ERROR to the General Term of the Supreme Court, in the first judicial department, to review judgment affirming a judgment of the Court of General Sessions of the Peace held in and for the city and county of New York, convicting the plaintiff in error of the crime of grand larceny. (Reported below, 16 Hun, 396.)

The facts appear sufficiently in the opinion.

*Ira Shafer*, for plaintiff in error. The legal effect of the bill of lading and sending the malt was to vest the title to it in the consignee, and it could not be varied by the evidence of Schelly as to the understanding between him and Zink. (Edw. on Bail, 119, 562; *Creery* v. *Holly*, 14 Wend., 26; *Hinsdale* v. *Weed*, 5 Den., 172–175, 178; *Davis* v. *Pattison*, 29 N. Y., 317, 320, 321; *Cayuga Co. Bk.* v. *Daniels*, 47 id., 631, 633; *Bassett* v. *Spofford*, 45 id., 387.) Schelly having parted with his possession of the malt and

his property in it, the malt upon its arrival and upon Zink taking possession became his property and could have been seized on an execution against him. (*Carpenter* v. *Griffin*, 9 Paige, 310; *Reed* v. *Abbey*, 2 N. Y. S. C. R., 390; *Morss* v. *Stone*, 5 Barb. S. C. R., 516; *Barnard* v. *Campbell*, 58 N. Y., 73–75; *Lloyd* v. *Brewster*, 4 Paige, 537; *Bank of Beloit* v. *Beale*, 34 N. Y., 473; *Cary* v. *Hotaling*, 1 Hill, 311; *Hugh* v. *Wilson*, 2 J. R., 46; *Duncan* v. *Dubois*, 3 id., 125; *Watson* v. *Delafield*, 2 Caines, 224; 1 Green. Ev., § 520, Red. ed.; *Morey* v. *Walsh*, 8 Cow., 238.) As Schelly intended to part with his property in the malt to Zink, the latter cannot be held guilty of larceny. (2 East. Pl. Crown, chap. 16; § 103; *Harvey's Case*, 2 Leach, 523; *Nicholson's Case*, id., 698; *Park's Case*, id., 703; 2 East's P. C., 553, 668; *Rex* v. *Harvey*, id., 669; *Rex* v. *Parks*, id., 671–672; *Rex* v. *Catherine Coleman*, id. ; *Rex* v. *Atkinson*, id., 773; *Saltus* v. *Everett*, 20 Wend., 267–279; *Ash* v. *Putnam*, 1 Hill, 302; *Ross* v. *People*, 5 id., 294; *Lewis* v. *Palmer*, Hill & D. Supp., 68; *Peabody* v. *Fenton*, 3 Barb. Ch., 541; *Stevens* v. *Hyde*, 32 Barb., 1 Eng. Law & Eq. Rep., 579; *Felter* v. *The State*, 9 Yerg., 397; 1 Hawk, chap. 19, bk. 1, § 23; *Cary* v. *Hotailing*, 1 Hill, 311, 315; *Ross* v. *The People*, 5 id., 294; *Com* v. *Lewer*, 15 Serg. & R., 93; *People* v. *McDonald*, 43 N. Y., 61; *Kelly* v. *The People*, 13 N. Y. S. C. R., 509; *Smith* v. *The People*, 53 N. Y., 111; *Ross* v. *People*, 5 Hill, 294; *Dwer* v. *Commonwealth*, 5 S. & R., 93; 2 Russell on Crimes, 28; *Hilderbrand* v. *People*, 56 N. Y., 394; *Reg.* v. *Dowles*, 12 Cox C. C., 269; *Loomis* v. *The People*, 67 N. Y. R., 322; 1 Hawk Pl. Cr. § 1, p. 108; 2 Russ on Crimes [5th Am. ed.], 95; *McDonald* v. *People*, 43 N. Y., 61; *Foster's Crown Cases*, 123; *Weyman* v. *People*, 4 Hun, 511, 515; *McCourt* v. *People*, 64 N. Y. R., 583; *Regina* v. *Goodbody*, 8 Car & P., 665; *Regina* v. *Thomas*, 9 id., 741; Bish. on Cr. L., §§ 431–433.)

*Benjamin K. Phelps*, for defendant in error. Upon the facts proved the prisoner was guilty of larceny. (*Hilder-*

*brand* v. *People*, 1 Hun, 19; *Weyman* v. *People*, 4 id., 511; *Lewis* v. *People*, 67 N. Y., 322; *Smith* v. *People*, 53 id., 111; *Ross* v. *People*, 5 Hill, 294; *Mowrey* v. *Walsh*, 8 Cow., 238; *People* v. *McDonald*, 43 N. Y., 61.)

Danforth, J. The plaintiff in error was indicted for the larceny of 501 sacks of malt, the property of John Schelly; he was tried and convicted at a court of General Sessions, in and for the city of New York. No evidence was introduced in his behalf, and at the close of the case on the part of the People, his counsel asked the court to direct an acquittal upon the ground, among others, that upon the evidence the prisoner was not guilty of the offence charged. The court refused to do so, and the prisoner's counsel excepted. The court then submitted the case to the jury, saying : "If you believe that the prisoner previous to the shipment of the malt, formed the design to obtain from Schelly, the property in question and to defraud him of the same, and in furtherance of that design knowingly and falsely represented to ·Schelly that there *was a demand in New York City*, for malt at $1.60, and $1.65 per bushel, and Shelly relying thereon forwarded the property to the prisoner for the purpose, and with the understanding that the prisoner should sell and dispose of it for Schelly's account and benefit for cash or good notes at and for the price of not less than $1.60, or $1.65, a bushel, and that the prisoner in pursuance of his design, received said property, and appropriated and converted it to his own use, with intent to cheat and defraud Schelly thereof, and not to account to him therefor, then he is guilty of larceny, without regard to whether he afterwards sold the goods or not."

The prisoner's counsel excepted to this instruction, and asked the court to charge the jury : "that if they find from the evidence that Schelly sent the property to Zink, intending Zink to sell the same, and to convey a title to the purchaser, they must acquit, even though Zink intended not to

account for the proceeds, but to convert them to his own use. Also, if they find from the evidence that Schelly gave credit to Zink for the property described in the indictment in consequence of Zink's representations to him they must acquit, even though they should find that the representations were false to his knowledge, and that he made them with a preconceived design not to pay for the malt."

The precise meaning of this request is apparent when read in connection with the motion for an acquittal, one ground of which was " that Schelly gave credit to Zink to the extent of trusting him to sell the malt and account for the proceeds. " Also, " if Schelly shipped the goods to Zink, and intended Zink should sell them, because of Zink's false and fraudulent representations, and but for such representations he would not have shipped the goods, they must acquit. " Also, " if Schelly was induced to send the malt to Zink with the understanding between them that Zink should sell the same and account to Schelly for the proceeds, they must aquit even though they should also find that Zink when he received and sold the malt, did not intend to account for the proceeds, but intended to convert, and did convert the proceeds to his own use. " Also, "that if Schelly was induced to send the malt to Zink, in consequence of his fraud, and the latter never intended to pay for the same, or to account for the proceeds of the same, yet if Schelly's intention in sending the malt, was to have Zink sell and deliver the same to a purchaser, and to account to Schelly for the proceeds, they must acquit. "

The court refused to charge as requested, and to each refusal defendant's counsel excepted. The court did charge however that if Schelly sold and delivered the property to Zink, they must acquit, although he was induced to make such sale and delivery by the fraud of Zink, and although Zink never intended to pay for them.

The evidence disclosed the following facts : Schelly was a malster residing in Hamilton, Ohio, from which place he visited New York city in August, 1874, and then on the

recommendation of one Vobel, a man in the employ of Schelly, he sought out Zink, and told him that he had come to New York to sell malt, and wanted his assistance. They went together to several breweries but found no customers. One Ehret however said he would perhaps buy some, the then next fall. Nothing further occurred at that time between Zink and Schelly, and the latter went home. In December, 1874, with no communication in the meantime from Zink or Ehret, Schelly sent to Ehret two car loads of malt. Ehret refused to receive them. He informed Schelly by letter that he "had a big supply of malt, and could not take it." On the 28th of December Zink wrote to Schelly, " when you were here to see me, you wanted to sell some barley malt and flour. I now have a good chance to sell some for you. Let me know the price as soon as you can, and your terms."

It should be noticed that up to this time there is no solicitation by Zink, nor request for any consignment, and an inquiry now simply for price and terms. Schelly replied by letter " prices are to-day $1.65 for Canada malt ; $1.60 for Ohio, delivered in New York ; " informed him of the shipment to Ehret, and that he declined taking it, "therefore I request you to go to Ehret in case he refuses to take the malt, then try to sell it somewhere else," at the prices stated in the letter. " Let them give the bill of lading to you at once." He also sends him samples by mail, and prices from the newspapers. On the eighth of January, Zink telegraphed, " malt received. Good. Send me two car loads of Canada malt, one of Ohio malt. I will see you as soon as this order is received."

On the twelfth February, Zink sent statement showing sale of malt at $1.65 and $1.60, and enclosed Diehl's note for $1,983.62, at sixty days, for net proceeds payable to order of Zink, and indorsed by him.

On the eighteenth Zink telegraphs again, " two car loads of malt received. Send three of same kind as soon as possible. Letter follows." On the twenty-second February

he wrote, " I will be up and see you about the seventeenth of March, and bring the money for the two car loads, also money, or good paper for the three cars that are now coming," and wants three cars more saying " I have the order for three."

In January Zink went to Hamilton. Schelly told him " he had no right to sell that malt on credit, he ought to sell it to brewers and good men ; he, Zink, said the note of Diehl was good as gold, he owns a large property on One Hundred and Thirty-fourth street and Third avenue, keeps a large store there," and made other representations as to Diehl's business ability. He wanted more malt, and Schelly not having sacks enough, Zink telegraphed Diehl for 800; he sent Schelly 1200. " These were filled and sent to Zink; he said he would come next week, and pay the money." Zink did return to Hamilton, but without money, carrying two more notes, which he gave Schelly, and Schelly received. Zink saying they would be paid at maturity. These were payable to Zink's order, and by him indorsed, due in two months.

In all thirteen car loads were sent. The last on the 1st of March, 1875.

Schelly says " Zink promised to sell the malt to good men and get cash or notes. I expected him to do so." All the malt was billed to Zink in this form, "Peter Zink, Melrose, N. Y. Bought of John Schelly," etc., describing the goods, except the first two car loads, which in like form were billed to Ehret. Bills of lading were also taken by Schelly from the railroad company for the several car loads " to be delivered to Peter Zink or assigns, he or they paying freight on the same at the customary rates, thirty-three cents per hundred. Schelly says " he expected Zink to sell the malt, and account to him for the price, less the freight."

" Q. Except the freight, you expected Zink after selling the malt to return you that amount ?

A. Yes, sir.

Q. You expected him to sell the malt, and return you the amount less the freight.

A. Yes, sir.

Q. You expected him to sell the goods in order that he should get the money.

A. Yes, sir.

Q. You meant he should do that.

A. Yes, sir."

Schuster, a butcher and drover, not acquainted with the malt business, was introduced to Zink in January, and then at Zink's request, commenced making advances on account of the malt, and sold the first two car loads on commission for Zink, and the rest he bought himself at prices varying from $1.15 to $1.30. Schuster employed brokers, and the malt was sold in the open market. It was shown that the price of malt for cash, between January and March was at no time up to $1.60, " but on credit was most of the time at $1.60." Sometimes fully up to $1.56. It is the law of this case as given to the jury, and it is now conceded by the learned counsel for the defendant in error that if under the circumstances in evidence Schelly had parted with the title to Zink, the latter could not have been guilty of larceny. We think the court should have gone farther, and charged, that if Schelly authorized Zink to sell the property to others, he could not be convicted of that crime. He did invest him with a paper title, and so enabled him to confer a title upon a purchaser, good not only against third persons, but good against Schelly himself. And it was obviously Schelly's intention that Zink should confer such a title, without consultation with him. The purchaser might lawfully buy the property of Zink, believing it to be his property, and that belief induced and warranted by the written evidence of title which Schelly had himself prepared, and in regard to the form of which Zink was in no wise privy. Zink did not ask Schelly to invest him with the title ; that was Schelly's own voluntary act. By the bills of sale, Zink is represented as the purchaser. By the bills of lading the property was deliverable to Zink, or his assigns. Schelly parted voluntarily with the actual possession of the property, and by vesting the title in Zink, although for the

purpose of a sale, parted with the constructive possession of it. Nay, if Zink had himself sent him the money at the price named less the freight the title of Zink would have been perfect in substance as well as form. The evidence would have warranted the jury in finding that Schelly intended to part absolutely with the ownership, possession and control of the property, and it cannot be doubted that with that finding the crime of Zink would have been the crime of false pretences. There is still in this State the crime of larceny, and the crime of obtaining property under false pretences, with different definitions by statute, and subjecting the offender to different punishments; the one a misdemeanor, the other a felony. All distinction between them has been abolished in some of the States of the Union, but until the Legislature interferes, the courts of this State have no right or power to disregard that distinction however technical it may seem. This distinction as we understand it is this : In larceny, the owner of the thing stolen has no intention to part with his property therein; in false pretences, the owner does intend to part with his property in the thing, but this intention is the result of fraudulent contrivances. And one test we conceive to be this : Could the offender confer a good title upon another by the sale and delivery of the thing ? (I do not mean to apply this test to the case of money), but goods and chattels. If obtained by larceny it is clear he could not, (*Bassett* v. *Spofford*, 45 N. Y., 388.) If obtained by fraud it is equally clear that he could, for in that case the property passes in the subject matter. In the former case it does not.

Trespass will not lie for goods obtained by fraud, because fraud does transfer the property. (Benjamin on Sales, 353 ; *Root* v. *French*, 13 Wend., 570.)

In the case before us the jury if charged as requested might have found upon the evidence that the prosecutor did intrust Zink not only with the possession of the malt, but the *indicia* of property in it, on the faith of his promise to account to him for the proceeds of the sale, when made.

And more than this the very language of the bill of lading, chosen by Schelly, imposed upon Zink when he received the malt, the obligation to pay freight upon it, and without that payment he could not have received the property from the carrier. He fulfilled that obligation, and thus by the voluntary act of Schelly acquired not only the absolute and unconditional possession of the malt, but a special property in it to the extent of freight paid, and the *indicia* of perfect ownership. Under such circumstances there can be no larceny. In *Wilson* v. *The State*, (1 Porter [Ala. Rep.], 118,) it is laid down as the law " that an indictment for larceny will not lie if it appear that the articles alleged to be stolen have been transferred so as to create any right or property, or by any consideration express or implied, or agreement." That was this case. By the bill of sale and the bill of lading, an apparently perfect title was given to Zink, and even as between him and Schelly, a special property or lien upon the malt to the extent of his advances, and a trust as to the whole was created, or credit given. From the moment the malt was shipped by Schelly in the name of Zink, the bill of lading taken in his name and sent to him by Schelly, Zink became the pledgee and special owner of the malt, and in the possession of it; for the possession of the carrier was his possession, as special owner and holder of the bill of lading. Schelly remained the general owner, but he did not have the possession or the right to the possession, or to dispose of or control the malt. Any possession which he might obtain, or dominion he might exercise over the malt without the assent of Zink, would have been tortious, and he could transfer no title to another. This relation of Zink and Schelly towards the property results from the application of elementary principles, but they were reiterated and enforced by this court in the case of the *Marine Bank* v. *Fiske et al.* (71 N. Y., 353).

I regard the principle, upon which that case was put, decisive of the one before us. Schelly had divested himself of even the apparent title or authority to dispose of the

malt.   He had placed it in Zink, and upon a sufficient con-
sideration, in the payment of freight, made him its special
owner.   That this relation was induced by fraud does not
alter the force of the position.   For our inquiry is whether
the malt was obtained tortiously, or by the consent of the
owner.   Whether the taking was larcenous, or whether
Schelly parted with the possession and with the property.
If the latter, then although the transaction was voidable, it
was not void, and until disaffirmed by Schelly it was effectual
to convey the title.   "If," says *Parke B.*, "a person through
the fraudulent representations of another delivers to him a
chattel, intending to pass the property in it, the latter can-
not be indicted for larceny, but only for obtaining the
chattel under false pretences."   (*Powell* v. *Heyland*, 6 Ex.,
70; *Rex* v. *Adams*, Russ & Ryan, C. C., 225; *Regina* v.
*Thompson*, Leigh & Case, C. C., 233; *Regina* v. *Cook*, L. R.,
1 C. C., 295.)

The contention in behalf of the defendant in error is,
and such was the opinion of the court below, that nothing
was given to the prisoner but the custody of the property
for the accomplishment of a particular object, that he
acquired no title to or right to withhold it from the con-
signor, that the latter continued to be its owner, and could
at any time, while the prisoner retained possession, have
recovered it from him, and countermanded his authority
over it; and in this is error, for Schelly gave Zink power to
confer upon a purchaser a good title to the property, and
as we have seen Zink could hold it even as against Schelly
until repaid his advances.   The bill of lading passed the
legal title to the malt, and the circumstance that Zink was
to account to Schelly afterwards, does not alter the case.   In
*Lickbarrow* v. *Mason* (C. East, 22), it is said, that "a factor
who has a legal property in goods, can never have that
property taken from him till he is paid the uttermost farthing
that is due to him."   It is said Zink was to pay over the
proceeds to Schelly ; this is not quite accurate.   When the
goods were sold he was to repay himself for freight advanced

in the first place, then to account to Schelly for the residue. Again, one who has advanced, or is under an agreement to advance on account of property consigned to him cannot be considered a mere servant, or mere agent, so that, his possession shall be the possession of the general owner.

It may be granted that Schelly could, if defrauded, disaffirm all that he had done, if he acted before a *bona fide* purchaser from Zink obtained the property ; that he could not do this afterwards shows that there was no larceny, for if stolen Zink could give no title. But until disaffirmed the title and the property passed. There is another test which if applied will enable us to solve the question. Assume that no fraud was practiced, and that the goods reached Zink. After this Schelly changes his mind, and will have the goods sent to another market. He could not have that done until Zink had been repaid his advance for freight. Schelly must then, have parted with the property, or an interest in the property to Zink, else he could take it at his pleasure.

It seems to me that the decision of this court in the case of *Bassett* v. *Spofford* (45 N.Y., 388,) recognizes the difference which we have suggested between false pretence and larceny, and unless overruled by subsequent decisions, controls the case at bar, and if followed must lead to a reversal of this conviction. ALLEN J., with the concurrence of all the members of the court, save GROVER J., not voting, p. 391, adopts from Leach the definition of larceny, " as the felonious taking of the property of another without his consent and against his will with intent to convert it to the use of the taker," * * * and says " the fraudulent and wrongful taking being proved, with the felonious intent, the *animo furandi*, the only question remaining in any case is whether the taking was with the consent of the owner, for if so, although the consent was obtained by gross fraud, there is no larceny. But the consent must be to part with the property, and not the naked possession, for a special purpose ; " again, "if the owner intends to part with the property, and delivers the possession, there can be no larceny, although

fraudulent means have been used to induce him to part with the goods. " Now apply this doctrine to the facts in this case. .

1st. It is clear that Schelly did consent to the taking by Zink ; he himself devised the mode of doing it. He procured the bills of lading without request from Zink, dictated their terms, prescribed the condition of delivery to him, " he paying freight," removed the malt from his warehouse to the cars, directed the carrier to deliver to Zink, and entered into a written contract with the carrier requiring it. He parted with possession.

2d. Thus not only the charge or custody of the malt came to Zink, but the legal possession. His possession was not the possession of Schelly. It was not a naked possession. The malt was in his hands for sale, not as a servant or care-taker, but as one to whom it was entrusted to sell, not to a particular person, but to any one. He had dominion over it ; as to all the world, except Schelly, as owner, and as to him as consignee and as one having a lien for freight. He had not the bare custody of the malt to keep, or hand over to a particular person, but was *entrusted* with the property, and the *indicia* of ownership, and this implies an intention on the part of the owner to do something more than give the custody of the property to him, or to make him a mere conduit for its transmission. It means confidence reposed, and credit given to him, not merely as a custodian, but in reliance upon his judgment and discretion in disposing of the malt. Schelly intended Zink should sell the malt, he never expected it to be returned to him, and it made no difference to whom Zink sold it.

3d. It follows that Schelly also intended to part with the property as well as the possession. This is indicated by the bill of sale, which in terms vests the title in Zink, subject undoubtedly to be avoided by Schelly for fraud at any time before Zink had disposed of it to a *bona fide* purchaser. The case is the same, so far as this question is concerned, as if Zink had been the purchaser in fact, as he was in form.

Schelly parted with the title, and intended to do so, he accompanied the title with the possession, and as it seems to us, intended to part with the property, and the possession, and so the case is within the decision above cited.

There can be no larceny where there is no trespass. (*People* v. *Call*, 1 Denio, 123.) There it is said a servant has the charge, but not the possession of his master's goods, and the servant may commit larceny although he has the custody of the goods " but," say the court, " when possession of the property is obtained by one as a bailee or purchaser, although by tricks, or fraud, the case stands on other grounds." And Zink although not a purchaser, was at least a bailee.

Says *Bishop* in his work on *Criminal Law*, vol. 2, § 817 : " There can be no trespass where there is a consent to the taking. Suppose the consent is obtained by fraud ; where the owner means to part with his property absolutely, and not merely with the temporary possession of it, the result is the same, for by reason of the consent there is still no trespass, therefore no larceny. " So it was held where the prisoner was the prosecutor's servant, his duty being in the absence of the clerk to purchase on his master's behalf, any kitchen stuff brought upon the premises for sale. On one occasion ·he falsely pretended to the clerk he had bought some stuff for a sum named, which sum he demanded, and it was paid out of his master's funds ; the court held, that as the money was voluntarily parted with, and was not to be returned, the transaction was not larceny, but false pretence. (*Regina* v. *Barnes*, 2 Denison's C. C., 59; S. C., 1 Eng. L. & Eq., 579.) In the case before us there was no expectation on the part of Schelly that the malt should be returned. Again, larceny implies a changing of property, and to be effectual must deprive the owner not only of the possession but the property. If therefore the consent of the owner is to a transfer of title, however that transfer is to be brought about, there can be no larceny.

In this case the jury might have found had the question framed by the prisoner's counsel been submitted to them,

that Schelly sent the malt to Zink, intending Zink should sell the same, and convey a title to the purchaser. In view of such a finding if the rule is as we have above suggested, there would be no larceny. It should be observed that no person was indicated as the one to whom Zink should sell, but he had general authority. Schelly was parting with the property, expecting at some future time to receive from Zink the proceeds.

In *Ross* v. *People* (5 Hill, 294), a conviction for larceny was reversed, because says COWEN, J., "the goods were delivered by the owner with the intention to sell them," and this although the pretended purchaser "obtained them by false pretences, and a design *ab initio* not to pay for them." To the same effect is *Mowrey* v. *Walsh* (8 Cow., 238), and the ground on which *The People* v. *McDonald*, was placed by this court in 43 N. Y., 61, sustains the view we have endeavored to present. The court say in that case : "If the prosecutor had entrusted the draft to the prisoner for the purpose of getting the gold, and the latter had obtained it and converted it, it would not have been larceny because the prosecutor would have had no possession but that of the prisoner. * * * *. It is quite clear that the prosecutor never intended to entrust either the draft or the gold with the prisoner."

On the other hand in the case before us, it is clear that Schelly did entrust the malt to Zink in the fullest and most unreserved manner. He intended to part with its possession and control, and never expected its return. And indeed, we might add also that it was disposed of in precisely the manner he expected it would be, though with a somewhat different result.

The learned counsel for the defendant in error in support of the conviction relies upon *Hilderbrand* v. *People* (1 Hun, 19; *Weyman* v. *People* (4 id., 511); *Loomis* v. *People* (67 N. Y., 322; *Smith* v. *People*, 53 id., 111.)

We think there is a clear distinction between those cases and the present.

In *Smith* v. *People* (*supra*) the prisoner called upon a wife, and stated that her husband had been arrested, and had sent him to her to get some money for his discharge. She gave him some jewelry to pawn, and directed him to give the ticket and money to the husband. He did neither, and his story was false. He was indicted for larceny, and the conviction sustained, the court, saying : " The owner did not part with the property in the chattels, or transfer the legal possession. The accused had merely the *custody*, the *possession and ownership remaining in the* original *proprietor*.

" The rule is, that when the delivery of goods is made for a *certain*, *special* and *particular purpose*, the possession is still supposed to *reside*, not *parted with*, in *the first proprietor*.

" A distinction is made betwen a *bare charge* for *special use of the goods*, and a *general bailment;* and it is *not larceny if the owner intends to part with the property and deliver the possession absolutely, although he has been induced to part with the goods by fraudulent means*. If by trick or artifice the owner of property is induced to part with the *custody* or *naked possession* to one who receives the property *animo furandi*, the owner still meaning to retain the right of property, the taking will be larceny ; *but if the owner part with not only the possession, but right of property also, the offence of the party obtaining them will not be larceny, but that of obtaining goods by false pretenses.* "

*Hilderbrand* v. *People* (56 N. Y., 396), was not considered in the Supreme Court, but on review this court say : " We do not think the prosecutor should be deemed to have parted either with possession of or property in the bill. It was an incomplete transaction to be consummated in the presence and under the personal control of the prosecutor. There was no trust or confidence reposed in the prisoner, and none intended to be. The delivery of the bill and giving change were to be simultaneous acts, and until the latter was paid the delivery was not complete. The prosecutor laid his bill upon the counter, and impliedly told the prisoner that he could have it upon

delivering to him $49.90. Until this was done, neither possession nor property passed, and in the meantime the bill remained in legal contemplation under the control, and in the possession of the prosecutor. " In the *Weyman Case*, (4 Hun, 511), the question came up. On the memorandum order certain articles were applied for, " for the purpose of showing a customer, and enabling him to select, which if either, he would take, and if he accepted either, the money, and the other articles, was to be returned. "

In *Loomis* v. *People*, (67 N. Y., 322,) the court say : it cannot be denied that the prosecutor intended to part with the possession or the ownership of the money. It was handed over for a particular purpose with no intention to loan it, or surrender the title, and it was only in case of its loss that other money was to be procured upon the check. Great importance is attached to the fact that it was passed over for a temporary purpose, and the learned judge who delivered the opinion says, the case is on the border line. While considering the distinction between larceny and false pretences, he says :   " It will be observed that the intention of the owner to part with his property is the gist and essence of the offence of larceny, and the vital point upon which the crime hinges and is to be determined. "

None of these cases determine or indicate any principle upon which the conviction in the case before us can be sustained.

In all of them the property was placed in the hands of the wrong-doer for a specific purpose. In none of them was the legal possession changed, nor was there an intention to part with the title or interest in the property.

In the case before · us the prisoner lawfully acquired the absolute possession of the property. A title by the voluntary act of the prosecutor ; a special property in it, and right of possession even against the prosecutor, because in accordance with the very terms which he prescribed, Zink paid freight upon its carriage.

In none of the cases referred to, can the property be said

to have been entrusted to the prisoner; here it was. The prosecutor reposed confidence in him, trusted the property to him for sale to such person as he might select, intended to part with his title, and never expected to see the malt again. He intended to part with his property before he received the money; the two events were not to be simultaneous. His consent to the transfer of the property was full, and without conditions, and in such a case there can be no larceny, although the consent was obtained by fraud. We think the exception to the charge of the trial judge was well taken, and that he should have charged as requested by the prisoner's counsel. Therefore the judgment of the Supreme Court and the conviction should be reversed, and a new trial granted.

All concur.

Judgment reversed.