[Crim. No. 5421. In Bank. Feb. 19, 1954.]

THE PEOPLE, Respondent, v. GEORGE H. ASHLEY, Appellant.

248

George H. Ashley, in pro. per., Wallace E. Wolfe, Jr., under appointment by the Supreme Court, and Benjamin D. Brown, for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant was convicted of four counts of grand theft under section 484 of the Penal Code. He "appeals from the verdicts and judgments as to each count," and from the order denying his motion for a new trial.

The first two counts charged that defendant feloniously took $13,590 from Mrs. Maude Neal on June 19, 1948, and $4,470 from her on August 3, 1948. The remaining two counts charged that he feloniously took $3,000 from Mrs. Mattie Russ on November 19, 1948, and $4,200 from her on December 4, 1948.

Defendant was the "business manager" of "Life's Estate, Ltd.," a corporation chartered for the purpose of "introducing people." Although defendant did run, and had full authority to run the affairs of the corporation, its capital stock was owned by Mrs. Edith Wingrave, defendant's sister-in-law, and Mr. and Mrs. Leo Butts, defendant's son-in-law and daughter. Mrs. Wingrave and the Buttses were also the officers and directors of the corporation.

In the latter part of 1948 Mrs. Russ, then about 70 years of age, visited the offices of Life's Estate at 1537 North La Brea Avenue in Hollywood. She was introduced to defendant, who persuaded her to join the "Life's Estate Philosophical Society." On November 18, 1948, in response to a telegraphic invitation, she returned to the La Brea offices and was offered a position as matron and hostess at a salary of $100 a month with a rent-free apartment on the property. She accepted the offer. As defendant was driving Mrs. Russ to her home in Long Beach, he went by a lot on Sunset Boulevard on which stood two sheet metal buildings. Defendant told her that "he owned that property and they also owned the La Brea property at 1537." As they drove on, defendant asked Mrs. Russ if she had any ready cash. When she told him that she had $3,000 he explained that he was building a theater on the Sunset property and needed money to proceed with the construction. He offered her interest at the rate of 6 per cent and security in the form of a first mortgage or trust deed on the La Brea property. Mrs. Russ agreed to make the loan and to go with defendant to her bank the following morning. When they arrived at the bank, defendant refused to go in with Mrs. Russ. She entered alone and secured $3,000 in currency from a safe deposit box. Defendant then took her in his automobile to a bank in Westchester, a suburb of Los Angeles. On arrival at this bank she turned the money over to defendant in reliance on his representations that she would get a first mortgage on the La Brea property and that the money would be used in the construction of a theater on the Sunset Boulevard lot, which she believed he owned. Defendant gave her a receipt for the

money, which stated that she was to receive a first trust deed on the La Brea property. The money was deposited to the account of Life's Estate at the Westchester Branch of the Security-First National Bank. The corporation's books show that on that day the cash account was subject to an overdraft of $4,151.93.

After this transaction was completed, defendant took Mrs. Russ to the offices of Life's Estates and later to dinner. At dinner he told her that he needed more money to complete the theater building and asked her to make an additional loan. She said that she had a note, secured by a trust deed and a chattel mortgage, worth $4,200 that she had acquired from the sale of the home in which she had previously lived. She agreed to transfer these documents to defendant. This loan and the previous one of $3,000 were to be consolidated, and he agreed to give her a first mortgage for the full amount against the La Brea property. On November 20, 1948, defendant drove Mrs. Russ once again to her bank, which held the documents and acted as her agent for the collection of installments. Again defendant insisted that she enter the bank alone. After securing the documents, Mrs. Russ suggested that they return to the bank and have the bank's employees prepare the transfer, but defendant insisted that the necessary papers could be prepared in his office. The transfer was made that day. It was stipulated that the note secured by the trust deed and chattel mortgage was sold by defendant and the proceeds of the sale deposited to the account of Life's Estate. They were used for the operating expenses of the corporation.

On November 25, 1948, Mrs. Russ moved into an apartment at the La Brea property and undertook the duties of matron and hostess. She testified that her many requests for the promised first mortgage were unavailing and that she returned to defendant her receipt for the $3,000, when he told her that she would receive the mortgage if she did so. After frequent quarrels over the failure to deliver the mortgage and over the tasks assigned her, Mrs. Russ left the employ of Life's Estate on March 31, 1949. At this time she received a note of the corporation secured by a second trust deed on unimproved property in Nichols Canyon owned by the corporation. Mrs. Russ testified that, although this security was worthless to her, she took it because defendant had told her to "take that or nothing."

It was proved that the Sunset property was owned by the corporation and that no theater was ever built thereon. The La Brea property was owned by Dr. Louis Phillips, who had leased the property to Mrs. Wingrave for a period of five years. He had not authorized anyone to place an encumbrance on this property.

Mrs. Russ testified that she did not receive a note prior to the one accompanying the second deed of trust on the Nichols Canyon property. When shown a letter, signed by her, acknowledging receipt of the note and second deed of trust and agreeing to cancel and return a prior note, she refused to admit that the signature was hers, because of the reference to the prior note. It was stipulated that the signature was genuine.

Thereafter, Mrs. Russ made a number of smaller loans to defendant. She testified that the loans were made in response to appeals that they were necessary to maintain public utility service and the like. All of these loans were repaid. In payment of the loans of $3,000 and $4,200 Mrs. Russ received four postdated checks drawn by Life's Estate. After it had become clear that these checks would not be paid, defendant drove Mrs. Russ to a high point in Nichols Canyon and asked for an extension of time. Mrs. Russ was frightened by their proximity to the edge of a steep embankment. Earl Farnsworth, an employee of Life's Estate, met them on the road as defendant had instructed him to do. He testified that he delivered an envelope to defendant, who opened it and gave Mrs. Russ the contents, a promissory note payable six months from date. She finally agreed to an extension but said that she wanted the time shortened. After pleading that he couldn't raise the money in any shorter length of time, defendant finally agreed to change the term of the note from six to four months. He made the change, gave the note to Mrs. Russ and told Farnsworth to return and pick up his remains. Mrs. Russ testified that she consented to the extension because she was frightened by defendant's driving so near to the edge of a sheer slope and by his threats to take his own life so that she might be paid from the proceeds of his life insurance policies.

In support of the two counts charging defendant with grand theft from Mrs. Maude Neal the People introduced the testimony of Mrs. Neal at the preliminary hearing, since she had returned to her North Carolina home and was not available at the time of the trial.

Mrs. Neal became interested in Life's Estate through a newspaper advertisement and Leo Butts called to sell her a membership. She later went to the La Brea office, where Mrs. Wingrave introduced her to defendant. After some preliminary conversation he asked her if she owned any property. She replied that she owned $17,500 worth of war bonds. He learned that the bonds were kept in a lock-box in Mrs. Neal's home in North Carolina. Defendant then introduced Mrs. Neal to Dr. Ulysses Meyer, a psychologist associated with Life's Estate. After some further talk, Mrs. Neal signed a note for $40 and became a member.

Between March and June of 1948, defendant and Mrs. Neal had a number of conversations regarding her money. She was offered a position as matron and hostess with an apartment rent-free if she would let him have all her money. He stated that he wanted her money to take up an option that he had to buy the El Patio Theater for $165,000, which he said was worth $500,000. Defendant said that he would give Mrs. Neal a note of Life's Estate and a trust deed on the theater building. She was unable to decide whether to make the loan, but offered to have her bonds mailed to her. Defendant insisted that this method was too slow and prevailed upon her to telephone her daughter to send the bonds by airmail. After receiving the bonds, Mrs. Neal went to the office of Life's Estate and talked to defendant. When she reintroduced the subject of security, he flew into a rage, saying that she talked as though she did not trust him. She called on Dr. Meyer, told him of the conversation, and then left with her bonds. At 10 o'clock that night, Leo Butts called for her and she went with him to the offices at La Brea, where she met defendant. He said that Dr. Meyer had told him that she was afraid to let them have her money, and that he was sorry if he had given her the impression that they were not honest. He again told her that she would have good security for her loan because the corporation was worth a half-million dollars and had $125,000 worth of equipment in the building alone. After some further conversation she agreed to make a loan.

On the next day, June 19, 1948, defendant called for Mrs. Neal and drove her to the Inglewood Branch of the Security-First National Bank. Some of the bonds were not redeemable at a bank, so Mrs. Neal obtained only $13,590 at this time. She purchased a cashier's check for the amount, endorsed it

and gave it to defendant, who endorsed it and deposited it to the account of Life's Estate on the same day. Mr. Nelson of the Security-First National Bank testified that he had a conversation with defendant and Mrs. Neal at this time, and they told him that the money was needed to make a down payment on the El Patio Theater. Mrs. Neal was then taken to a bank in Westchester, to which she moved her bank account at defendant's request. The remaining bonds were turned over to this bank to be forwarded to the Department of the Treasury for redemption. Mrs. Neal testified that she had never agreed to lend the money that was to be realized from these bonds.

Mrs. Neal received a note from Life's Estate for $13,500, but did not receive the deed of trust. · An escrow for the purchase by Life's Estate of the El Patio Theater was opened at the Westchester Branch of the Security-First National Bank with a deposit of $5,000 on June 23, 1948. The escrow was closed and the deposit was withdrawn on July 13, 1948. Defendant's attorney testified that the purchase was cancelled by agreement, after defendant had unsuccessfully attempted to secure a reduction in the purchase price, because the motion picture projection booth would have to be remodelled to conform to fire regulations, and because of encroachments and easements that would be exempted from the policy of title insurance.

Mrs. Neal testified that, so far as she knew, the purchase had taken place when she went to the La Brea office of Life's Estate on August 3, 1948. There she found a check for $4,470, naming her as payee, which had been sent to the La Brea address in payment for the bonds transmitted through the Westchester bank. Mrs. Neal endorsed the check, but did not take possession of it. It was subsequently deposited to the account of Life's Estate. After waiting until the offices were empty, defendant said that he wished to speak to her in his office. He offered her a new note for $17,500, but she said that she did not want to give him the rest of her money because she might need it to buy a car or to make a down payment on a home. After she had refused an offer of a car as a token of appreciation, defendant took a gun from a drawer, placed it on the desk, and said, ''Now look here, Mrs. Neal. I don't want no monkey business out of you. Do you understand that?'' Frightened by defendant's demeanor and the presence of the gun, Mrs. Neal picked up the new note and returned the $13,500 note.

Sometime after the events just related, defendant told Mrs. Neal that the theater building had been condemned and that the deal had fallen through. The record also discloses that Mrs. Neal consulted an attorney, but no action was taken. She had received only $649.49 in interest on her loans at the time of trial.

Witnesses for the defense presented a completely different version of the facts. Leo Butts testified that each of the women had voluntarily offered to make unsecured loans to the corporation. The offers were made to the corporation's officers, who accepted them. It was stipulated that Mrs. Butts would testify similarly. There was also testimony that Mrs. Russ must have known that the La Brea property was owned by Dr. Phillips, that Mrs. Neal had advised cancellation of the El Patio purchase in the early part of July and had refused an offer to return her money, and that she had been so eager to lend the proceeds from her bonds that she called Leo Butts to take her to the office at 9:30 p. m., whereupon he took her there, and the transaction was completed in his presence.

There is little evidence concerning the financial standing of the corporation or defendant's participation in the profits. The incorporation took place in December of 1947, when there were only 100 members. Capital stock of a face value of $25,000 was issued, but the corporation did not receive all of this amount in cash. Extensive improvements on the leased office property were paid for by the corporation. Leo Butts testified that the membership had increased to approximately 2,000 at the time the loans were made, but that only $40 was charged for each membership, an insufficient amount in view of the high expenses. Thereafter the fees were raised to a maximum of $100. Butts also testified that the corporation could not afford to pay defendant a salary, and that he donated "his business knowledge to our small organization." Butts admitted, however, that defendant drove a Lincoln automobile bought by the corporation, and had received and cashed numerous checks for expenses. The fact that the postdated checks given to Mrs. Russ in payment of one of her loans could not be met, and that the loans of both Mrs. Russ and Mrs. Neal were used to meet overdrafts or for the current operating expenses of the corporation, indicates that the corporation was having financial difficulties.

The case went to the jury with instructions relating to

larceny by trick and device and obtaining property by false pretenses. The jurors were instructed that all would have to agree on the type of theft, if any, that was committed. Defendant contends that the evidence is insufficient to support a conviction of either type of theft, that the general verdict of guilty was unlawful, and that the trial court erred in denying his motion for a new trial on these grounds.

Although the crimes of larceny by trick and device and obtaining property by false pretenses are much alike, they are aimed at different criminal acquisitive techniques. Larceny by trick and device is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession. (See *People* v. *Delbos,* 146 Cal. 734, 736-737 [81 P. 131]; 12 Cal.Jur., ''False Pretenses,'' § 13.) In this state, these two offenses, with other larcenous crimes, have been consolidated into the single crime of theft (Pen. Code, § 484), but their elements have not been changed thereby. (*People* v. *Myers,* 206 Cal. 480, 483-485 [275 P. 219]; *People* v. *Jones,* 36 Cal.2d 373, 376-377 [224 P.2d 353]; *People* v. *Selk,* 46 Cal.App.2d 140, 147 [115 P.2d 607].) The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. Indictments and informations charging the crime of ''theft'' can now simply allege an ''unlawful taking.'' (Pen. Code, §§ 951, 952.) Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an ''unlawful taking'' has been proved. (*People* v. *Plum,* 88 Cal.App. 575, 581-582 [263 P. 862, 265 P. 322]; *People* v. *Myers,* 206 Cal. 480, 484 [275 P. 219]; *People* v. *Fewkes,* 214 Cal. 142, 149 [4 P.2d 538]; see, also, *People* v. *Palmer,* 92 Cal.App. 323, 326 [268 P. 417].) The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses. (*People* v. *Nor Woods,* 37 Cal.2d 584, 586 [233 P.2d 897].) In the present case, it is clear from the record that each of the prosecuting witnesses intended to pass both title and possession, and that the type of theft, if any, in each case, was that of obtaining property by false pretenses. Defendant was not prejudiced by the instruction to the jury relating to

larceny by trick and device. Indeed, he requested instructions relating to both larceny by trick and device and obtaining property by false pretenses. Moreover, his defense was not based on distinctions between title and possession, but rather he contends that there was no unlawful taking of any sort.

To support a conviction of theft for obtaining property by false pretenses, it must be shown that the defendant made a false pretense or representation with intent to defraud the owner of his property, and that the owner was in fact defrauded. It is unnecessary to prove that the defendant benefited personally from the fraudulent acquisition. (*People* v. *Jones,* 36 Cal.2d 373, 377, 381 [224 P.2d 353].) The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause. (*People* v. *Chamberlain,* 96 Cal.App.2d 178, 182 [214 P.2d 600] and cases there cited.) If the conviction rests primarily on the testimony of a single witness that the false pretense was made, the making of the pretense must be corroborated. (Pen. Code, § 1110.)

The crime of obtaining property by false pretenses was unknown in the early common law (see *Young* v. *The King,* 3 T.R. 98, 102 [1789]), and our statute, like those of most American states, is directly traceable to 30 Geo. II, chapter 24, section 1 (22 Statutes-at-Large 114 [1757]).[1] In an early Crown Case Reserved, *Rex* v. *Goodhall,* Russ. & Ry. 461 (1821), the defendant obtained a quantity of meat from a merchant by promising to pay at a future date. The jury found that the promise was made without intention to perform. The judges concluded, however, that the defendant's conviction was erroneous because the pretense "was merely a promise of future conduct, and common prudence and caution would have prevented any injury arising from it." (Russ. & Ry. at 463.) The correctness of this decision is questionable in light of the reasoning in an earlier decision of the King's Bench (*Young* v. *The King, supra*—not mentioned in *Rex* v. *Goodhall*). By stating that the "promise of future conduct" was such that "common prudence and caution" could prevent

---

[1] This statute provided, in part, that "all persons who knowingly and designedly, by false pretence or pretences, shall obtain from any person or persons, money, goods, wares or merchandizes, with intent to cheat or defraud any person or persons of the same ′. . . shall be deemed offenders against law and the publick peace. . . ." (*Cf.* Pen. Code, § 532.)

any injury arising therefrom, the new offense was confused with the old common law "cheat." The decision also seems contrary to the plain meaning of the statute,[2] and was so interpreted by two English writers on the law of crimes. (Archbold, Pleading and Evidence in Criminal Cases 183 [3d ed., 1828]; Roscoe, Digest of the Law of Evidence in Criminal Cases 418 [2d Amer. ed., 1840].) The opinion in *Rex* v. *Goodhall, supra,* was completely misinterpreted in the case of *Commonwealth* v. *Drew* (1837), 36 Mass. (19 Pick.) 179, in which the Supreme Judicial Court of Massachusetts declared (at 185), by way of dictum, that under the statute "naked lies" could not be regarded as "false pretenses." On the basis of these two questionable decisions, Wharton formulated the following generalization: ". . . the false pretense to be within the statute, must relate to a state of things averred to be at the time existing, and not to a state of things thereafter to exist." (Wharton, American Criminal Law 542 [1st ed., 1846].) This generalization has been followed in the majority of American cases, almost all of which can be traced to reliance on Wharton or the two cases mentioned above. (*Chaplin* v. *United States,* 157 F.2d 697; *People* v. *Karp,* 298 N.Y. 213 [81 N.E.2d 817]; *Steely* v. *Commonwealth,* 171 Ky. 58 [186 S.W. 883]; but see *Commonwealth* v. *Murphy,* 96 Ky. 28 [27 S.W. 859]; *State* v. *Ferris,* 171 Ind. 562, 564-565 [86 N.E. 993]; *People* v. *Orris,* 52 Colo. 244 [121 P. 163]; *State* v. *Shevlin,* 81 N.H. 121 [123 A. 233]; *State* v. *Knott,* 124 N.C. 814 [32 S.E. 798]; *Spriggs* v. *Craig,* 36 N.D. 160, 162 [161 N.W. 1007]; *State* v. *Howd,* 55 Utah 527, 533 [188 P. 628]; *Frank* v. *State,* 244 Wis. 658 [12 N.W.2d 923]; *State* v. *Higgins,* 148 Tenn. 609 [256 S.W. 875]; *Commonwealth* v. *Moore,* 99 Pa. 570, 574; *State* v. *Alick,* 62 S.D. 220 [252 N.W. 644]; Wharton on Criminal Law, § 1439 (12th ed., 1932); Clark and Marshall on Crimes, § 359 (5th ed., 1952); 168 A.L.R. 835-837.) The rule has not been followed in all jurisdictions, however. Some courts have avoided the problems created by the rule by blurring the distinctions between larceny by trick and device and obtaining property by false pretenses. (See generally, Pearce, *"Theft by False Promises,"* 101 U.of Pa.L.Rev. 967; and see the development in the fo¹

---

[2]The word "pretence" in the middle of the eighteenth century w apparently a synonym for the words "purpose" and "intention," well as the words (more common today) "pretext" or "misrepresent tion." See 8 The Oxford English Dictionary 1326, col. 1 (1933). See also, Webster's New International Dictionary 1959, col. 1 (2d ed., 1948).

lowing New York cases: *Loomis* v. *People*, 67 N.Y. 322 [23 Am.Rep. 123]; *Zink* v. *People*, 77 N.Y. 114 [33 Am.Rep. 589]; *People* v. *Miller*, 169 N.Y. 339, 349-355 [62 N.E. 418, 88 Am.St.Rep. 546]; *People* v. *Noblett*, 244 N.Y. 355, 358-365 [155 N.E. 670]; *People* v. *Karp*, 75 N.Y.S.2d 169 [273 App.Div. 779]. However, the decision in *People* v. *Karp*, *supra*, holding that "[i]rrespective of the promissory nature of the representation . . ., it was larceny," was reversed on appeal. The old distinctions were reestablished, and obtaining property by false promises was held not indictable. *People* v. *Karp*, 298 N.Y. 213 [81 N.E.2d 817]. A development similar to that in the New York cases took place in a series of decisions of the Texas Court of Criminal Appeals: see *Rundell* v. *State*, 90 Tex.Crim.Rep. 410 [235 S.W. 908]; *Contreras* v. *State*, 118 Tex.Crim. Rep. 626 [39 S.W.2d 62]; *De Blanc* v. *State*, 118 Tex.Crim.Rep. 628 [37 S.W.2d 1024]; *Whitehead* v. *State*, 148 Tex.Crim.Rep. 190 [185 S.W.2d 725]; *cf. People* v. *Weibert*, 18 Cal.App.2d 457, 462-464 [64 P.2d 169].) Other courts have repudiated the majority rule (*State* v. *McMahon*, 49 R.I. 107, 108 [140 A. 359]; *Commonwealth* v. *Morrison*, 252 Mass. 116, 122 [147 N.E. 588]; *Commonwealth* v. *McKnight*, 289 Mass. 530, 546-547 [195 N.E. 499]; *Commonwealth* v. *McHugh*, 316 Mass. 15, 22 [54 N.E. 2d 934]; *Commonwealth* v. *Green*, 326 Mass. 344, 348 [94 N.E.2d 260] [see Pearce, *supra*, 101 U.of Pa.L.Rev. 967, 983-987]; *State* v. *Singleton*, 85 Ohio App. 245, 254-261 [87 N.E. 2d 358]; see, also, *State* v. *Healy*, 156 Ohio St. 229, 244 [102 N.E.2d 233]),[3] and it has been changed by legislative enactment (Neb.Rev.Stat., ch. 28, § 28-1207 [Cum.Supp. 1947]), by drawing an analogy to the civil action for deceit (*State* v. *Nichols*, 1 Del.Crim.Rep. (Houston) 114, 115; *State* v. *McMahon*, *supra*, 49 R.I. 107, 108), and by construing a promise as a representation of the "ability" or "intent" of the promisor to perform (*People* v. *Cohn*, 358 Ill. 326, 333 [193 N.E. 150]; *Smith* v. *Fontana*, 48 F.Supp. 55, 59-60; *Hameyer* v. *State*, 148 Neb. 798, 801 [29 N.W.2d 458]; *The Queen* v. *Gordon* (1889), L.R. 23 Q.B.D. 354, 359, 360; *Rex* v. *Bancroft* (1909), 3 Cr.App.Cas. 16, 21; *Rex* v. *Alexandra*, 26 Crim.

---

[3]The majority rule was also rejected by the United States Supreme Court in the construction of the federal mail fraud statute, 17 Stats. 283, 323. See *Durland* v. *United States*, 161 U.S. 306, 313 [16 S.Ct. 508, 40 L.Ed. 709]. On the basis of the Durland case, the statute was amended to include specifically false promises. 35 Stats. 1130, 18 U.S.C. § 1341 (1946). See Pearce *supra*, 101 U.of Pa.L.Rev. 967, 978-980.

App.R. 116 (1937); cf. *Rex* v. *Asterley,* 7 Car.& P. 191, 173 Eng.Rep. 84 (1835)).

In California, the precedents are conflicting. Early decisions of the District Courts of Appeal follow the general rule as originally formulated by Wharton (*People* v. *Green,* 22 Cal.App. 45, 48 [133 P. 334]; *People* v. *Kahler,* 26 Cal. App. 449, 452 [147 P. 228]; *People* v. *Reese,* 136 Cal.App. 657, 663-665 [29 P.2d 450]; *People* v. *Downing,* 14 Cal.App. 2d 392, 395 [58 P.2d 657]; *People* v. *Jackson,* 24 Cal.App.2d 182, 203-204 [74 P.2d 1085]; *People* v. *Daniels,* 25 Cal.App. 2d 64, 72 [76 P.2d 556]; see, also, *People* v. *Walker,* 76 Cal. App. 192, 205 [244 P. 94]; but see *People* v. *Morphy,* 100 Cal. 84 [34 P. 623]), but more recently it has been held (and the holdings were approved by this court in *People* v. *Jones,* 36 Cal.2d 373, 377 [224 P.2d 353]) that a promise made without intention to perform is a misrepresentation of a state of mind, and thus a misrepresentation of existing fact, and is a false pretense within the meaning of section 484 of the Penal Code. (*People* v. *Ames,* 61 Cal.App.2d 522, 531-532 [143 P.2d 92]; *People* v. *Gordon,* 71 Cal.App. 2d 606, 624-625 [163 P.2d 110]; *People* v. *Chamberlain,* 96 Cal.App.2d 178, 182 [214 P.2d 600]; *People* v. *Davis,* 112 Cal.App.2d 286, 289, 298-300 [246 P.2d 160]; *People* v. *Frankfort,* 114 Cal.App.2d 680, 698 [251 P.2d 401]; see, also, *People* v. *Bratten,* 137 Cal.App. 658 [31 P.2d 210]; *People* v. *Mason,* 86 Cal.App.2d 445, 449-450 [195 P.2d 60]; *People* v. *Staver,* 115 Cal.App.2d 711, 716-720 [252 P.2d 700]; *People* v. *Silva,* 119 Cal.App.2d 863 [260 P.2d 251].) These decisions, like those following the majority rule, were made with little explanation of the reasons for the rule. The Court of Appeals for the District of Columbia has, however, advanced the following reasons in defense of the majority rule: ''It is of course true that then, [at the time of the early English cases cited by Wharton, *supra*] as now, the intention to commit certain crimes was ascertained by looking backward from the act and finding that the accused intended to do what he did do. However, where, as here, the act complained of— namely, failure to repay money or use it as specified at the time of borrowing—is as consonant with ordinary commercial default as with criminal conduct, the danger of applying this technique to prove the crime is quite apparent. Business affairs would be materially encumbered by the ever present threat that the debtor might be subjected to criminal penalties if the prosecutor and jury were of the view that at the time

of borrowing he was mentally a cheat. The risk of prosecuting one who is guilty of nothing more than a failure to pay his debts is a very real consideration. . . .

"If we were to accept the government's position the way would be open for every victim of a bad bargain to resort to criminal proceedings to even the score with a judgment proof adversary. No doubt in the development of our criminal law the zeal with which the innocent are protected has provided a measure of shelter for the guilty. However, we do not think it wise to increase the possibility of conviction by broadening the accepted theory of the weight to be attached to the mental attitude of the accused." (*Chaplin* v. *United States,* 157 F.2d 697, 698-699; but see the dissenting opinion of Edgerton, J., at 699-701.) We do not find this reasoning persuasive. In this state, and in the majority of American states as well as in England, false promises can provide the foundation of a civil action for deceit. (Civ. Code, §§ 1572, subd. 4, 1710, subd. 4; see 125 A.L.R. 881-882.) In such actions something more than nonperformance is required to prove the defendant's intent not to perform his promise. (*Newman* v. *Smith,* 77 Cal. 22, 26 [18 P. 791]; *Berkey* v. *Halm,* 101 Cal.App.2d 62, 69 [224 P.2d 885], and cases there cited; Rest. Torts, § 530, com. *c.*) Nor is proof of nonperformance alone sufficient in criminal prosecutions based on false promises. (See, for example, *People* v. *Gordon, supra*; *People* v. *Chamberlain, supra*; *People* v. *Frankfort, supra*; *People* v. *Davis, supra*; *Rex* v. *Kritz* (1949), 1 K.B. 82.) In such prosecutions the People must, as in all criminal prosecutions, prove their case beyond a reasonable doubt. Any danger, through the instigation of criminal proceedings by disgruntled creditors, to those who have blamelessly encountered "commercial defaults" must, therefore, be predicated upon the idea that trial juries are incapable of weighing the evidence and understanding the instruction that they must be convinced of the defendant's fraudulent intent beyond a reasonable doubt, or that appellate courts will be derelict in discharging their duty to ascertain that there is sufficient evidence to support a conviction.

 The problem of proving intent when the false pretense is a false promise is no more difficult than when the false pretense is a misrepresentation of existing fact, and the intent not to perform a promise is regularly proved in civil actions for deceit. Specific intent is also an essential

element of many crimes.[4] ██ Moreover, in cases of obtaining property by false pretenses, it must be proved that any misrepresentations of fact alleged by the People were made knowingly and with intent to deceive. If such misrepresentations are made innocently or inadvertently, they can no more form the basis for a prosecution for obtaining property by false pretenses than can an innocent breach of contract. ██ Whether the pretense is a false promise or a misrepresentation of fact, the defendant's intent must be proved in both instances by something more than mere proof of nonperformance or actual falsity (*cf. United States* v. *Ballard*, 322 U.S. 78 [64 S.Ct. 882, 88 L.Ed. 1148]), and the defendant is entitled to have the jury instructed to that effect. "[T]he accepted theory of the weight to be attached to the mental attitude of the accused" is, therefore, not "broadened," but remains substantially the same. (*Cf. Chaplin* v. *United States, supra,* 157 F.2d 697, 699.)

██ It has been contended that the express provision for obtaining property by false promises in section 182 of the Penal Code[5] indicates that the Legislature did not regard such promises as "false pretenses" within the meaning of sections 484 and 532 of the Penal Code. In support of this contention it is urged that if the obtaining of property by false promises with fraudulent intent not to perform such promises were regarded as a crime it was unnecessary to provide for such a crime in subdivision 4 of section 182. It is then concluded that since words of a statute cannot be regarded as superfluous, if a reasonable construction thereof will give effect to them and preserve all other words of the statute, the provision in section 182 for obtaining property by false promises can be given effect only on the theory that the Legislature did not regard the obtaining of property by such promises as a crime and therefore as being

[4]For example, arson, burglary, larceny, malicious mischief, and robbery. In prosecutions for attempted crimes, or for assault with intent to commit murder, robbery, rape, etc., the specific intent must also be proved.

[5]Section 182: "If two or more persons conspire: 1. To commit any crime; 2. Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime; 3. Falsely to move or maintain any suit, action or proceeding; 4. To cheat or defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises; 5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws. They are punishable as follows: . . ."

covered by subdivision 1. This argument proves too much. Subdivisions 2 and 3 provide for conspiracies to commit acts that would amount to perjury or subornation of perjury. Subdivision 4 provides for conspiracies to cheat or defraud any person of his property "by any means which are in themselves criminal," and to obtain property by false pretenses, a crime defined in sections 484 and 532 of the Penal Code. Subdivision 5 likewise includes acts that are criminal. Since these provisions describe many acts that are undoubtedly crimes, and thus included in the broad language of subdivision 1, they were probably added by the Legislature out of an abundance of caution to insure the carrying out of its purpose to include all such acts within the scope of the section. The same abundance of caution is evidenced in subdivision 4 by the inclusion of both "false pretenses" and "false promises" even though the former includes the latter. The omission of a comma after "false pretenses" also indicates that the Legislature did not set the one off from the other as a separate class of crime but regarded them as the same kind of crime.

If false promises were not false pretenses, the legally sophisticated, without fear of punishment, could perpetrate on the unwary fraudulent schemes like that divulged by the record in this case and those described in *People* v. *Davis, supra, People* v. *Gordon, supra, People* v. *Frankfort, supra,* and *People* v. *Chamberlain, supra.* To hold that false promises are not false pretenses would sanction such schemes without any corresponding benefit to the public order. ▮ The inclusion of false promises within sections 484 and 532 of the Penal Code will not "materially encumber" business affairs.▮ "Ordinary commercial defaults" will not be the subject of criminal prosecution, for the essence of the offense of obtaining property by false pretenses is (as it has always been) the fraudulent intent of the defendant. This intent must be proved by the prosecution; a showing of nonperformance of a promise or falsity of a representation will not suffice.

---

[6]As shown above, to obtain property by false promises has been an indictable offense in a number of states for many years. . Our attention has not been directed to a judgment of conviction in any of those states that is based on a transaction remotely resembling an "ordinary commercial default." One scholar reports that inquiries directed to the Better Business Bureaus in the leading cities of those states received entirely negative answers. The business community does not seem to be aware of an "ever present threat" of criminal prosecutions for breach of contract. See Pearce, *supra*, 101 U.of Pa.L.Rev. 967, 1007.

In contending that the evidence is insufficient to support his conviction for obtaining property by false pretenses, defendant argues that the testimony of Mrs. Russ and Mrs. Neal was not only contradicted, but was inconsistent and self-contradictory, and thus incapable of belief. ██ It was for the jury to sift the true from the false, to determine the credibility of the witnesses and the weight to be given the testimony of an individual witness, even if it was inconsistent. (*People* v. *White,* 115 Cal.App.2d 828, 831 [253 P.2d 108]; *People* v. *Frankfort,* 114 Cal.App.2d 680, 700 [251 P.2d 401]; *People* v. *Moulton,* 71 Cal.App.2d 195, 197 [162 P.2d 317].) ██ Defendant points to Mrs. Russ' testimony that defendant told her that "they" owned the La Brea property and to her later testimony that the loan was made directly to defendant, that the corporation "was not brought into this at all," and that she relied on his representation of ownership of the La Brea property. Mrs. Russ was 71 years of age at the time of trial. It is possible that the pronouns were interchanged owing to knowledge later acquired, a slip of the tongue, or to the fact that defendant and the corporation he represented had become one in her mind. These matters were for the jury to consider in determining the weight to be given the testimony; they do not, as is contended, destroy the testimony. ██ The same holds true with respect to Mrs. Russ' refusal to admit her signature to the letter acknowledging receipt of the note and trust deed from the corporation. It is apparent that this letter, typewritten on the stationery of Life's Estate, was not written by her, and that she refused to acknowledge the letter or her signature because the letter stated that she had received a note prior to the one whose receipt was acknowledged in the letter. After trial, a note dated January 5, 1949, was produced, which is presumably the one to which reference was made. Even if there was such a note, it does not follow that Mrs. Russ received it or that she realized what the contents of the letter were when she signed it. Even if she received the note and returned it as indicated in the letter, and thereafter forgot or concealed this fact, the matter is not material to the main issue and goes merely to credibility.

██ In the case of Mrs. Neal, defendant contends that the gun episode completely negates reliance on the representations, and that her testimony was so contradictory as to be inherently improbable. Mrs. Neal testified that she had

never agreed to lend the $4,470 that was to be realized on the bonds not redeemable at a bank. This testimony reflects a strong inability to make up her mind. Mrs. Neal took all her bonds to the bank in the first instance; thereafter she allowed the proceeds of the bonds not then cashed to be sent to her at the La Brea address; and finally she endorsed the check but did not take possession of it. The jury could reasonably conclude that she intended to make a loan of the money represented by the check at that time, in reliance upon the representations previously made. Thereafter, the gun episode occurred. It accomplished no more than an exchange of promissory notes, giving an outward appearance of regularity to the transaction. Defendant's contention that if any crime were proved in connection with his transactions with Mrs. Neal, it was extortion and not theft, must therefore be rejected. Defendant did not forcibly take Mrs. Neal's money in the gun episode. He had already acquired it, and the crime of theft had already been committed.

The evidence justified the implied finding that the money had been acquired with felonious intent. The jury could reasonably conclude that defendant was the true head of this organization, and had deliberately set out to acquire the life savings of his victims, one a woman nearing 70 and the other a woman of little education and rural background, and both with little or no business experience. The women were won over by flattering offers of positions in the organization and false promises of security for their loans, and thereafter held in line by importunate and then menacing supplications. The lure of an ambitious theater project was held before the eyes of each, a project that was never realized. The evidence was sufficient to sustain the implied finding that defendant never intended to acquire or build such a theater, and, indeed, the financial situation revealed by the evidence made the acquisition or building of such a theater illusory. The money acquired was needed and used for the running expenses of the corporation within a short time of its receipt.

Defendant also contends that the necessary proof of "corroborating circumstances" is lacking. It is the duty of the reviewing court to examine the evidence to determine whether the corroboration required by the statute has been proved; the weight to be given such evidence is for the jury.

The testimony of Mrs. Russ was fully corroborated. The witness Farnsworth testified that defendant had told him

that the Sunset property belonged to defendant, and that Farnsworth had been sent to an architect for plans of a theater to be built thereon. It was also shown that Mrs. Russ was given a second trust deed on the Nichols Canyon property. Mrs. Russ testified that she had been promised a first mortgage on the La Brea property; the defense maintained throughout that the loan was to be unsecured. The giving of the trust deed was indicative of a prior promise to give security. The testimony of various witnesses and the opening of the escrow clearly corroborate Mrs. Neal's testimony about defendant's promises to buy the El Patio Theater.

In addition, the fact that a defendant has made the same or a similar representation to another, although at a different time and place, is a corroborating circumstance. (*People* v. *Jones,* 36 Cal.2d 373, 379 [224 P.2d 353]; *People* v. *Chait,* 69 Cal.App.2d 503, 516 [159 P.2d 445]; *People* v. *McCabe,* 60 Cal.App.2d 492, 497 [141 P.2d 54]; *People* v. *La France,* 28 Cal.App.2d 152, 156 [82 P.2d 465]; *People* v. *Fisher,* 116 Cal.App. 243, 246 [2 P.2d 564]; *People* v. *Whiteside,* 58 Cal.App. 33, 41 [208 P. 132].) In the present case, essentially similar representations were made to each of the women. There is not only the similarity in express representations, but in basic approach, offers of employment, and repeated supplications. They may therefore corroborate each other. (*People* v. *Jones, supra.*)

The attorney general contends that additional corroboration may be found in the fact that defendant did not call Mrs. Wingrave, the president of the corporation, as a witness. As the record does not disclose that Mrs. Wingrave had any knowledge that would have thrown light on whether the representations had or had not been made, the failure to call her as a witness can have no bearing on this issue.

It is also contended that defendant's failure to testify is corroborative. A defendant's failure to take the stand "to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*People* v. *Adamson,* 27 Cal.2d 478, 489 [165 P.2d 3].) But the failure to testify will not supply a lacuna in the prosecution's proof. (*People* v. *Zoffel,* 35 Cal.App.2d 215, 221 [95 P.2d 160]; *People* v. *Adamson,* 27 Cal.2d 478, 489-490 [165 P.2d 3]; *People* v.

*Sawaya,* 46 Cal.App.2d 466, 471 [115 P.2d 1001]; *People* v. *Cox,* 102 Cal.App.2d 285, 287 [227 P.2d 290].) The rule is analogous to that in civil cases where the failure to produce evidence on the part of the defendant may not be considered until a prima facie case has been made by the plaintiff. (*Girvetz* v. *Boy's Market, Inc.,* 91 Cal.App.2d 827, 830 [206 P.2d 6]; *Breland* v. *Traylor Eng. & Mfg. Co.,* 52 Cal.App.2d 415, 425-426 [126 P.2d 455].) ▆ In criminal cases, after the prosecution has made a prima facie case, the failure of the defendant to testify is not affirmative evidence of any fact, and any inference that can, in the circumstance, be justly drawn therefrom is persuasive rather than probative, lending weight to the evidence presented by the prosecution. In the present case the corroborative evidence adduced by the State was sufficient to allow the case to go to the jury, which could then consider defendant's failure to deny or explain that evidence in determining the weight it was to be given.

Defendant contends that he was denied a fair hearing on his motion for a new trial and that the trial court abused its discretion in failing to grant a new trial on the ground of newly discovered evidence.

▆ Despite the fact that a daily transcript of the trial was available, three continuances of the hearing on the motion for new trial were granted at the request of defendant's counsel. The hearing was then set for July 20th upon the definite understanding that the motion was to be heard and decided then. On that day counsel argued the motion at length and announced that other parts of the motion were in the process of preparation by defendant who needed time to secure signatures to affidavits. No details as to the contents of the affidavits were furnished, nor did defendant's counsel state that defendant wished to argue. Counsel indicated that he would not argue the remaining part of the motion. A continuance was granted upon the condition that there would be no further oral argument. Neither the State nor the defense objected to this ruling. It was not until several more continuances had been granted, owing to the late filing of affidavits and the need to prepare counteraffidavits, that the motion was submitted and decided. It was within the discretion of the trial court to refuse any continuance on July 20th. (*People* v. *Winthrop,* 118 Cal. 85, 92 [50 P. 390]; *People* v. *Mayes,* 78 Cal.App.2d 282, 291-292

[177 P.2d 590].) The granting of a continuance upon the conditions and under the circumstances indicated, was proper.

When defendant's affidavit was filed, the trial judge commented upon the fact that documents were set forth three and four times therein, that it contained irrelevant statements, and that it was repetitious and argumentative. He commented that such an unnecessarily long (78 pages) affidavit tried not only the patience of the trial court, but that if it should go before an appellate court, "it would try their patience to the extent that it well deserves that saying of seeing how far it will fly up the stairs when you throw it."

Defendant contends that the attitude of the trial court, as reflected by the denial of additional oral argument and its remarks, denied a fair and impartial hearing on the motion for new trial. ▓ If the trial court misconceives or refuses to do its duty with reference to a motion for a new trial and denies reasonable opportunity for oral argument, a new trial must be granted. (*People* v. *Sarazzawski*, 27 Cal.2d 7, 15, 17-18 [161 P.2d 934].) The record shows, however, that despite his remarks, the trial judge carefully read and considered the affidavits presented and called for the originals of the documents mentioned therein. The affidavits filed by defendant were in effect the oral argument presented in written form. It is clear that a fair and impartial hearing on the motion was had.

▓ The newly discovered evidence consisted of documents allegedly withheld and suppressed by the district attorney and of affidavits relating to testimony that would show that Mrs. Neal had committed perjury. The documents were allegedly among the files of the corporation seized by the district attorney and not returned until such time that they could not be found and presented during the trial. This charge is a serious one. If true, it tends to show a deliberate attempt to convict on perjured testimony with full knowledge of its falsity. The facts, however, refute the charge.

An affidavit of a Miss Bartholomew, and an affidavit of defendant, averred that full access to the files of Life's Estate had not been given; that Mr. McClure, an investigator in the district attorney's office, had refused full access to the files. The truth of the averments therein was denied by counteraffidavits of the assistant district attorney and of Mr. McClure. An unverified affidavit of Miss Bartholomew told of threats to her made by the assistant district attorney relating to her foregoing affidavit.

There was more, however, than the mere denial of the charges and the implications therein. The only document that was material and that would almost certainly have produced a different result had it been authentic was one that purported to be the receipt that Mrs. Russ testified had been given her by defendant and later returned to him. This document, which bears the signature of Mrs. Russ, is singularly complete; it states that an agreement had been reached between Mrs. Russ and the board of directors of Life's Estate, that the loan was to be unsecured, that the loan was to be used for ''the purpose of paying on bills and other general expenses of Life's Estate, Ltd., and or at it's sole option, for maintaining and or improving the leased property at 1537 N. La Brea, which is leased from a Dr. Phillips, and or the property owned by the corporation at 7051 Sunset Boulevard, upon which an office and ballroom are now being constructed,'' and that Mrs. Russ was making the loan strictly upon her own investigation and reliance on the future possibilities of the business. The document contradicts every incriminating item of Mrs. Russ' testimony. Mr. Clark Sellers, a handwriting expert, testified that the signature was that of Mrs. Russ and that in his opinion it was a carbon impression of an original signature in pencil. In an affidavit, Mrs. Russ averred that she had never seen the document, that she had signed for a package of chocolates sent by a person who did not enclose a card or make himself known. The manager of the apartment house in which Mrs. Russ lived stated in an affidavit that a messenger had come to deliver the package, but refused to accept the manager's signature for it. It thus appears that the document had not been in the files held by the district attorney, but was manufactured, and that the signature thereon was procured by stratagem. Another such document, purporting to be the agreement of Mrs. Neal to the cancellation of the escrow and mentioning that her loan was unsecured, was filed with the appellate court almost a year after the files had been returned. That part of the document where Mrs. Neal's signature might have been, was torn off. The other matter presented as newly discovered evidence was cumulative, denied by counteraffidavits, and came from unreliable sources. The court did not abuse its discretion in denying the motion for a new trial.

Mrs. Neal's testimony at the preliminary hearing was read at the trial. Mrs. Neal was in North Carolina at the time

of trial, and was unable to come to this state. Section 686 of the Penal Code provides that a defendant has the right to be confronted with the witnesses against him in the presence of the court but that the deposition of a witness may be read if he is dead, insane, or cannot be found within the state, and if the charge has been examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant who has himself or through counsel cross-examined or had the opportunity to cross-examine.

At the preliminary hearing, a cashier's check for $13,590 payable to Mrs. Neal and endorsed by her was introduced in evidence, along with a bank deposit slip of the same date showing a deposit of the same amount to the account of Life's Estate. Mrs. Neal testified that she had endorsed this check to defendant and had given it to him. At the trial, the People introduced a second cashier's check of the same date and amount, payable to Life's Estate and endorsed for deposit by defendant. It appears that Mrs. Neal endorsed the first cashier's check back to the bank which then issued the second cashier's check payable to Life's Estate. Defendant contends that he was denied the opportunity to cross-examine Mrs. Neal about the validity of her signature on the second cashier's check and to impeach her testimony at the preliminary hearing. This contention is without merit. ▋ The right of confrontation can be waived (*People* v. *Wallin*, 34 Cal.2d 777, 781 [215 P.2d 1]), and defendant did not object to the introduction of the second cashier's check. Furthermore, the error in Mrs. Neal's testimony about the first cashier's check is apparent on the face of the second check. The issue was thus presented to the jury, and the trial court did not err in admitting the second cashier's check in evidence.

Defendant contends that the reading of Mrs. Neal's testimony at the trial deprived him of the right of confrontation in violation of the United States Constitution. Even if this right is guaranteed under the due process clause of the Fourteenth Amendment to the United States Constitution as contended by defendant (see *Snyder* v. *Massachusetts*, 291 U.S. 97, 106 [54 S.Ct. 330, 78 L.Ed. 674, 90 A.L.R. 575]), there is no merit in the contention. ▋ "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face-to-face, and of subjecting him to the ordeal of cross-examination." (*Mattox* v. *United States*, 156 U.S. 237, 244 [15

S.Ct. 337, 39 L.Ed. 409].) Defendant had that advantage at the preliminary hearing.

Although a count of criminal conspiracy was also involved at the preliminary hearing, that fact does not invalidate Mrs. Neal's testimony. Counsel examined the transcript and eliminated testimony that was inadmissible at the trial. The admissibility of controverted parts of the testimony was passed upon by the trial court before it was read to the jury.

The claim of error is predicated upon the denial of a motion to have the prosecution elect between the two counts charging defendant with grand theft from Mrs. Neal, and between the two counts charging him with grand theft from Mrs. Russ. It is contended that only one theft was committed as to each of the prosecuting witnesses. ▮ ''Where the proof in a given case is sufficient to show the existence of a fraudulent intent or purpose on the part of an accused to obtain property from another by false or fraudulent representations, the making of the first false representations which moved or induced the person to whom they were made to part with his property does not immune the defrauding person from punishment for subsequently obtaining from said person other property which was parted with under the influence of the fraudulent representations which were still operating on the mind of the defrauded person at the time he passed his property into the hands of said designing person.'' (*People* v. *Rabe,* 202 Cal. 409, 413 [261 P. 303].) This rule has been consistently followed in this state. (*People* v. *Scott,* 112 Cal.App.2d 350, 351. [246 P.2d 122] ; *People* v. *Howes,* 99 Cal.App.2d 808, 818 [222 P.2d 969] ; *People* v. *Miles,* 37 Cal.App.2d 373, 378-379 [99 P.2d 551] ; *People* v. *Ellison,* 26 Cal.App.2d 496, 498-499 [79 P.2d 732].)

▮ Defendant contends that he could not be charged with a prior felony conviction. He admitted conviction of conspiracy, a felony, and the serving of a term therefor in a federal penitentiary. For the first time on appeal, it is revealed that the crime was a conspiracy to use the mails to defraud, and it is contended that such a conviction is not a prior conviction within our statutes. It is. (Pen. Code, §§ 969b, 3024, subd. (c).) The fact that the minimum term of sentence is thereby increased does not render the law unconstitutional. (*People* v. *Dutton,* 9 Cal.2d 505, 507 [71 P.2d 218] ; *People* v. *Dunlop,* 102 Cal.App.2d 314, 316-317 [227 P.2d 281] ; 25 Am.Jur., Habitual Criminals, §§ 3-8.)

Defendant contends that the trial judge deprived him of a fair trial by limiting cross-examination, acting as prosecutor, slyly hinting to the prosecutor how to lead a witness. We find no basis in the record for these conclusions. ■ "It is not only the right but the duty of a trial judge to so supervise and regulate the course of a trial that the truth shall be revealed so far as it may be, within the established rules of evidence." (*People* v. *Mendez*, 193 Cal. 39, 46 [223 P. 65]; *People* v. *Martinez*, 38 Cal.2d 556, 564 [241 P.2d 224].) That duty was performed and the trial judge so conducted the trial as to fully safeguard defendant's rights.

■ Finally, defendant contends that the district attorney was guilty of misconduct in his argument to the jury, particularly when he said that Mrs. Russ was "robbed" of the security of her second trust deed at a later time. The jury was aware that no charge to that effect was involved, and that the word was used in the colloquial rather than the legal sense. The jury was properly cautioned.

The purported appeals from the verdicts are dismissed as nonappealable. The judgment and the order denying the motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

SCHAUER, J., Concurring and Dissenting.—I concur in the judgment solely on the ground that the evidence establishes, with ample corroboration, the making by the defendant of false representations as to existing facts. On that evidence the convictions should be sustained pursuant to long accepted theories of law.

It is unnecessary on the record to make of this rather simple case a vehicle for the revolutionary holding, contrary to the weight of authority in this state and elsewhere, that a promise to pay or perform at a future date, if unfulfilled, can become the basis for a criminal prosecution on the theory that it was a promise made without a present intention to perform it and that, therefore, whatever of value was received for the promise was property procured by a false representation. Accordingly, I dissent from all that portion of the opinion which discusses and pronounces upon the theories which in my view are extraneous to the proper disposition of any issue actually before us.

The majority opinion strikes down a rule of law, relating to the character and competence of proof of crime, which

has been almost universally respected for 200 years—and the reasoning which has been advanced for the innovation is that creditors, grand jurors, and prosecutors must not be expected to institute any criminal charges against innocent people, and that even if they do the intelligence of trial jurors and the wisdom of appellate judges can be depended upon to right the wrong, hence the time honored rule may be scrapped. The unreality of this reasoning and the wisdom of the old rule become obvious on reflection.

In a prosecution for obtaining property by the making of a false promise, knowingly and with intent to deceive, the matter to be proved, as to its criminality, is purely subjective. It is not, like the specific intent in such a crime as burglary, a mere element of the crime; it is, in any significant sense, all of the crime. The proof will necessarily be of objective acts, entirely legal in themselves, from which inferences as to the ultimate illegal subjective fact will be drawn. But, whereas in burglary the proof of the subjective element is normally as strong and reliable as the proof of any objective element, in this type of activity the proof of such vital element can almost never be reliable; it must inevitably (in the absence of confession or something tantamount thereto) depend on inferences drawn by creditors, prosecutors, jurors, and judges from facts and circumstances which by reason of their nature cannot possibly exclude innocence with any certainty, and which can point to guilt only when construed and interpreted by the creditor, prosecutor or trier of fact adversely to the person charged. Such inferences as proof of the alleged crime have long been recognized as so unreliable that they have been excluded from the category of acceptable proof.

As a basis for overturning the rule that proof of the mere making of a promise to perform in the future and of subsequent failure to perform is not proof of a false pretense, the majority opinion first purportedly adheres to the rule by stating that ''proof of nonperformance alone [is not] sufficient in criminal prosecutions based on false promises,'' then argues that ''Any danger, through the instigation of criminal proceedings by disgruntled creditors, to those who have blamelessly encountered 'commercial defaults' must, therefore, be predicated upon the idea that trial juries are incapable of weighing the evidence and understanding the instruction that they must be convinced of the defendant's fraudulent intent beyond a reasonable doubt, or that appel-

late courts will be derelict in discharging their duty to ascertain that there is sufficient evidence to support a conviction." This doctrine, if universally applied, would eliminate all rules governing the quality and sufficiency of proof. The credence to be placed in the testimony of accomplices, or other complaining witnesses, would be left entirely to the sagacity of jurors and the presumed omniscience of appellate judges. I am unwilling to accept as a premise the scholastic redaction of the majority that rules of proof may be set aside because appellate judges will always know when a jury has been misled and the proof is not sufficient. The most important function which courts have to perform in respect to criminal law is not to make easier the conviction of alleged miscreants; it is the protection of the innocent against false conviction. The highest duty which this court has to perform in the cause of justice is to protect the individual person against the power of the state; the most grievous injury it can do to the people is to assist in building a superstate by countenancing encroachments on the rights of individuals and whittling away at the rules which protect them.

The suggestion in the majority opinion that it is inconceivable "that trial juries are incapable of weighing the evidence [impliedly, with omniscient accuracy however inconclusive it be] and understanding the instruction that they must be convinced of the defendant's fraudulent intent beyond a reasonable doubt, or that appellate courts will be derelict [less than omniscient] in discharging their duty" affords no substantial basis for striking down a rule of proof. The opinion naively continues: "If . . . misrepresentations are made innocently or inadvertently, they can no more form the basis for a prosecution for obtaining property by false pretenses than can an innocent breach of contract"!

The tragic part of the above quoted philosophy is that the very declaration of it as a rule of law makes it false in fact. It becomes false in fact because when published as a rule of law it cuts the heart out of a pertinent safeguard which the accumulated wisdom of at least two centuries has found to be necessary to prevent the conviction of the innocent who have met with commercial misfortune.

With the rule that the majority opinion now enunciates, no man, no matter how innocent his intention, can sign a promise to pay in the future, or to perform an act at a future date, without subjecting himself to the risk that at some later date others, in the light of differing perspectives,

philosophies and subsequent events, may conclude that, after all, the accused *should* have known that at the future date he could not perform as he promised and if he—as a "reasonable" man from the point of view of the creditor, district attorney and a grand or trial jury—*should* have known, then, it may be inferred, he did know. And if it can be inferred that he knew, then this court and other appellate courts will be bound to affirm a conviction.

A trial by jury, under circumstances easily to be foreseen, would offer but hazardous protection in such a case. I have faith—great faith—in our jury system as now constituted. But I have developed that faith through seeing it operate under wise and time-tested regulations and limitations as to the essential characteristics of proof which do not unrealistically assume that any human—whether a district attorney or a grand juror or a trial juror or a judge or justice of a court—is beyond error.

The far reaching and revolutionary ruling of the majority opinion made under the circumstances shown, indicates to me not so much a desire to enforce law as a fervor to declare new law; the criticized ruling is not necessary to an affirmance in this case. Defendant here did more than merely make a promise, with or without a present intention to perform, to pay his victims in the future and fail to perform that promise. There is evidence from which it could be found that Mrs. Russ was induced to deliver property to defendant through reliance in a material degree on his knowingly false representations that he owned the La Brea property, on which he would give her a first mortgage,[1] whereas the property

---

[1]Defendant was accused in two separate counts of feloniously taking $3,000 in money from Mrs. Russ on or about November 19, 1948, and of feloniously taking $4,200 in money from her on or about December 4, 1948.

The People's evidence as to these counts shows the following: On November 18, 1948, defendant told Mrs. Russ that he owned the Sunset and the La Brea property, asked her if she had any cash, and when she replied that she had $3,000 stated that he would give her a first mortgage on the La Brea property if she would lend him the money. Later on the 18th defendant asked Mrs. Russ if she had any real or personal property and she told him that she had a first trust deed and a chattel mortgage.

On November 19 defendant drove Mrs. Russ to the bank and, induced by and in reliance on the misrepresentations, she delivered $3,000 in cash to him.

Defendant thereafter repeated his misrepresentations as to the La Brea property and his inquiries as to whether Mrs. Russ owned any other property, and stated that in exchange for the first trust deed she could have a first mortgage on the La Brea property. Either "four or five

was in fact owned by Dr. Phillips, who had leased it to an officer and stockholder of Life's Estate and had not authorized its encumbrance. There is evidence from which it could be found that a material element in the inducement of Mrs. Neal to deliver property to defendant was his knowingly false representation that she would have good security for her loan because Life's Estate was worth half a million dollars,[2] whereas it was in fact in financial difficulty. These false representations as to existing matters of fact would support the conviction. It has been consistently held in this state that even though there is but one misrepresentation, there are separate offenses of theft through false pretenses if property is obtained on separate occasions, because the crime is not complete until defendant obtains possession of the property.[3]

---

days'' after the cash transaction, or on November 20, defendant again drove Mrs. Russ to the bank and she obtained and turned over to him the trust deed and chattel mortgage. Defendant told her he would ''cash'' these evidences of indebtedness.

Shortly thereafter Mrs. Russ sold her trailer for $1,580 and turned this sum over to defendant, again in reliance on his representations as to the La Brea property.

About January 15, 1949, defendant sold the trust deed to a broker for $3,000.

[2]Defendant was accused in two separate counts of feloniously taking from Mrs. Neal $13,590 on or about June 19, 1948, and $4,470 on or about August 3, 1948.

The People's evidence as to these counts shows the following: In March, 1948, defendant met Mrs. Neal and asked her whether she had any property. She told him that she had $17,500 in ''war bonds.'' He learned by further questioning that the bonds were in North Carolina, discussed with her the making of a loan, and induced her to have the bonds sent to her.

After Mrs. Neal obtained possession of the bonds she inquired as to security and defendant replied that the security would be ''good,'' that Life's Estate was worth half a million dollars, that there was $125,000 worth of equipment in the La Brea building alone, and ''a lot of other property.'' On June 19, 1948, the day after defendant made the last mentioned representations, he drove Mrs. Neal to a bank where she cashed $13,590 of the bonds and endorsed and delivered to defendant the check for that amount which she received from the bank.

At defendant's instructions the remaining bonds, which could not be cashed directly by a bank, were mailed for cashing with directions that the check therefor be mailed to defendant. Defendant thereafter received a check dated August 2, payable to Mrs. Neal for $4,470. She endorsed this check on August 3 and defendant cashed it on August 4.

[3]The situation here is substantially similar to that in *People* v. *Rabe* (1927), 202 Cal. 409, 417 [261 P. 303], relied on by the majority. There defendant was charged in three counts with obtaining from one person by false pretenses $1,250 on August 2, $4,000 on August 5, and a deed to real property of the value of $11,000 on August 15. Each sum was in payment for stock in a corporation which defendant said would be, but which was not, thereafter incorporated. The false representations

## Evidence Constituting Corroboration

The requirement of section 1110 of the Penal Code that the false pretenses, if proved by the testimony of only one witness, be corroborated is met by evidence of similar pretenses made to another. (*People* v. *Whiteside* (1922), 58 Cal. App. 33, 41 [208 P. 132]; *People* v. *Munson* (1931), 115 Cal. App. 694, 697 [2 P.2d 227]; *People* v. *McCabe* (1943), 60 Cal.App.2d 492, 497 [141 P.2d 54].)

Here the representations of existing facts made to each of the victims, Mrs. Russ and Mrs. Neal, were similar; they were misrepresentations as to the existing ownership of property by defendant or Life's Estate which would constitute security for any loan they might make. The similarity of defendant's scheme in each case is shown also by the representations as to the use to which any loan would be put. Even though the representations as to things to be done in the future are not sufficient in themselves to support a conviction, they constitute a part of the fraudulent scheme and their similarities furnish additional corroboration. The employe of the bank who arranged for the cashing of Mrs. Neal's bonds testified that when defendant and Mrs. Neal came to the bank they stated that the proceeds of the bonds were to

---

were that certain assets had been acquired for and certain persons had agreed to act as officers of the proposed company. Defendant contended that one crime had been split into three parts. It was held, ''[p. 413] Where the proof in a given case is sufficient to show the existence of a fraudulent intent or purpose on the part of an accused to obtain property from another by false or fraudulent representations, the making of the first false representations which moved or induced the person to whom they were made to part with his property does not immune the defrauding person from punishment for subsequently obtaining from said person other property which was parted with under the influence of the fraudulent representations which were still operating upon the mind of the defrauded person at the time he passed his property into the hands of said designing person. . . . [p. 414] [T]he crime is accomplished when an accused receives into his possession property which he had planned to fraudulently gain. So in the instant case, while a general intent to defraud may have been formed in the mind of the accused at the time of or before he completed the first offense, the other crimes charged were completed as separate and distinct offenses on the days that he unlawfully took possession of the property described in the several counts of the indictment.''

The theory in false pretenses cases is somewhat similar to that in embezzlement cases where each act of fraudulent appropriation of a portion of property with which defendant is entrusted is a separate crime (*People* v. *Stanford* (1940), 16 Cal.2d 247, 251 [105 P.2d 969]) rather than that in larceny cases where the taking of property on different occasions and even from different owners pursuant to a general plan is treated as a single offense (*People* v. *Dillon* (1934), 1 Cal.App.2d 224, 229 [36 P.2d 416]).

be used in a real estate transaction involving a theatre. Also one Farnsworth, an employe of Life's Estate who was not a victim, testified that defendant told him that defendant owned the Sunset property.

Generally corroborative is the following evidence: Farnsworth testified that after Mrs. Russ had delivered her property to defendant she asked him for repayment at a time sooner than defendant was willing to agree to; that defendant, as well as Mrs. Russ, appeared to be excited; and that defendant said, "it will ruin me, and how am I going to raise the money." An investigator for the district attorney testified that he went to defendant's home and the offices of Life's Estate on April 17, 1950, and told defendant's wife and officers and employes of Life's Estate that he had a warrant for defendant's arrest; that on this occasion and on two other occasions when the investigator returned they did not disclose defendant's whereabouts; that after defendant was finally apprehended in Long Beach in August, 1950, he said that he had gone east in an attempt to raise funds, that he had known for some time that a warrant for his arrest had been issued, and that he had not yet surrendered because he wished to straighten out his affairs. Mrs. Shepard, a woman not shown to be a victim, testified that on April 15, 1950, she had a telephone conversation in which defendant told her that he was going out of the city for a few days to raise some money, that he would arrange that her money be returned, and that "I can't talk any longer . . . I am being watched."

The testimonies of Mrs. Russ and Mrs. Neal as to the circumstances under which they turned over their properties to defendant and as to subsequent circumstances are in some respects confused, but the jury may well have concluded that this confusion, rather than casting doubt on the essential portions of their testimonies as to the false representations, indicated an aspect of their characters which made defendant select them as victims.

On the subject of the nature of the representation necessary to constitute the crime (whether a "false promise" is a misrepresentation of past or existing fact), the jury were instructed as follows:

"To constitute the crime of theft by obtaining money by false pretense, the false pretense used must be a fraudulent representation of an existing or past fact . . .

"A mere expression of opinion or a statement concerning the future is not such a fraudulent representation . . .

"You are instructed that if you find that the statements made by the defendant were true when made, that a subsequent change in conditions, which made it impossible to carry out the statements as made would not make them a false representation . . .

"[A] promise is the expression of the present intent and is a fact. Therefore if a promise is unconditionally made and is made without intention of performance, it is a fraud. The secret intention of a contracting party not to perform a promised act which induces contractees to execute their agreement is an essential feature of his representation. Whether a promise made to effect a transaction by subverting the will and judgment of a promisee, was dishonest, is a matter for the jury to determine from all of the evidence in the case."

The last quoted instruction is in accord with certain dicta in *People* v. *Gordon* (1945), 71 Cal.App.2d 606, 624 [163 P.2d 110] [actually the false pretense upon which the conviction depended was not a mere promise; it was a misrepresentation as to the character and value of land and the stage of its development for oil production[4]], and *People* v. *Mason* (1948), 86 Cal.App.2d 445, 449 [195 P.2d 60] [here, likewise, the false pretense depended not on a mere promise; it was a misrepresentation as to existing facts pertinent to the value of oil stock, the drilling project of the company, its financial status, and the purpose of the defendant in letting the victim "get in because she was a friend of Enders"], cited by this court in *People* v. *Jones* (1950), 36 Cal.2d 373, 377 [224 P.2d 353], for the proposition (also interjected by way of dictum and entirely unnecessary to the decision) that "a promise, if unconditional and made without present intention of performance, will constitute actionable fraud." In the Jones case the actual misrepresentations are stated by the court as follows: "It appears from the testimony . . . that

---

[4]The true ground of the holding of the District Court of Appeal and the peculiar sense in which it used the word "promises" is evident from the following expression (p. 624 of 71 Cal.App.2d): "The 'assurances' and 'guarantees' of immediate profitable sales or leases for the vendees were of the nature of promises. If a promise is unconditional and is made without intention of performance it is actionable fraud . . . If the jury determined that defendants knew or had good reason to believe that the acres they were selling were outside of the productive limits of an oil field or that they had no belief that the land sold was underlain with oil in commercial quantities . . . then they were warranted in finding that defendants had committed theft by false pretense."

defendant induced their [the complaining witnesses'] advancements of money upon the following representations: That the business was 'a gold mine,' was 'making nothing but money,' and 'there wasn't a chance of losing'; that the equipment of the firm 'was all paid for'; and that more money was needed to secure new equipment.'' All of such representations obviously related to alleged existing facts, and were false. There are similar wholly unnecessary expressions in *People* v. *Ames* (1943), 61 Cal.App.2d 522, 531-532 [143 P.2d 92] [the actual holding was that ''Because a false statement of a present fact is coupled with a false promise of a future act, it does not overcome the effect of the false pretense concerning the present fact''], and *People* v. *Chamberlain* (1950), 96 Cal.App.2d 178, 182 [214 P.2d 600] [a positive statement as to ownership of a horse]. All the cases cited in this connection are, of course, out of line with the traditional view that proof of a false promise does not establish the crime. They do not attempt to explain or disapprove, but simply ignore, those many other California cases which hold in considered opinions that a false promise is not a false pretense upon which a conviction of theft can be based.

### The Weight of Authority

The traditional view that the representation must be of a present or past fact, and that a mere promise to perform an act in the future will not support a conviction, is expressed in the following cases: *People* v. *Wasservogle* (1888), 77 Cal. 173, 174 [19 P. 270]; *People* v. *Green* (1913), 22 Cal.App. 45, 48, 51 [133 P. 334] [conviction reversed because defendant's statements which induced victim to part with property were promises, not misrepresentations of fact]; *People* v. *Kahler* (1915), 26 Cal.App. 449, 452 [147 P. 228] [same]; *In re James* (1920), 47 Cal.App. 205, 206 [190 P. 466]; *People* v. *Mace* (1925), 71 Cal.App. 10, 21 [234 P. 841]; *People* v. *Walker* (1926), 76 Cal.App. 192, 205 [244 P. 94]; *People* v. *Moore* (1927), 82 Cal.App. 739, 746 [256 P. 266]; *People* v. *White* (1927), 85 Cal.App. 241, 250 [259 P. 76]; *People* v. *Cale* (1930), 106 Cal.App.Supp. 777, 780 [288 P. 430] [conviction reversed because representations were in form of promises]; *People* v. *Robinson* (1930), 107 Cal. App. 211, 221 [290 P. 470]; *People* v. *Reese* (1934), 136 Cal. App. 657, 663 [29 P.2d 450] [conviction reversed because representations were as to future use to be made of money]; *People* v. *Downing* (1936), 14 Cal.App.2d 392, 395 [58 P.2d 657];

*People* v. *Jackson* (1937), 24 Cal.App.2d 182, 204 [74 P.2d 1085] [conviction reversed because representations related only to the future]; *People* v. *Daniels* (1938), 25 Cal.App.2d 64, 71 [76 P.2d 556]; see, also, *People* v. *Cravens* (1947), 79 Cal.App.2d 658, 664 [180 P.2d 453] [conceding that representation must be of present or past fact; unnecessary to rely on theory that making a promise without intent to perform is a false representation of a present fact, the promisor's state of mind].

According to an annotation in 168 American Law Reports 833, 835, "The rule is well established in most jurisdictions that the criminal offense of obtaining money or other valuable thing by false pretense is not predicable upon the present intention of the defendant not to comply with his promises or statements as to his future acts." The annotation also collects the comparatively few cases which take the view that a false promise is a misrepresentation as to the present fact of the promisor's state of mind.

Although I would follow the traditional rule supported by the great weight of authority both in California and elsewhere, rather than that innovated or suggested by way of dicta in the mentioned cases, I do not believe that here the giving of the instruction to the effect that a promise may be a false pretense requires a reversal. The representations of defendant as to existing facts and as to future matters were inextricably interwoven; it may confidently be inferred that the jury believed that all such representations were made; the conviction can be upheld on the basis of the factual misrepresentations and the promissory statements can be considered simply as corroborative; they are in truth but a part of the res gestae. On no reasonable view of the evidence, and the instructions read together, can it be said that there has been a miscarriage of justice.

I think that the judgment should be affirmed but that the highly controversial discussion which is unnecessary to the decision and is aimed at establishing a new rule in California, contrary to the weight of authority here and generally elsewhere, should be eliminated.

Carter, J., concurred.

Appellant's petition for a rehearing was denied March 17, 1954. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.