Straub Distributing Co., Inc., a California Corporation, et al. [1] v. Commissioner. Straub Distributing Co. v. Commissioner
Docket Nos. 4294-68, 4295-68, 5204-68.
United States Tax Court
T.C. Memo 1971-46; 1971 Tax Ct. Memo LEXIS 286; 30 T.C.M. (CCH) 207; T.C.M. (RIA) 71046; March 15, 1971. Filed Leonard B. Hankins, 4014 Long Beach Blvd., Long Beach, Calif., for the petitioners. Sheldon M. Sisson, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Docket No.
Petitioner
Year ended
Amount of deficiency
4294-68
Straub Distributing Co. Inc.,
Apr. 30, 1965
$ 7,628.41
a California Corporation
Apr. 30, 1966
11,212.27
4295-68
Arthur O. Straub
Dec. 31, 1965
7,089.19
5204-68
Cecilia P. Straub
Dec. 31, 1965
7,171.33
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether Straub Distributing Co., Inc., sustained a theft *288 loss during its fiscal year ended April 30, 1966, as a result of having money obtained from it by false pretenses. (2) If Straub Distributing Co., Inc., did not sustain a theft loss with respect to certain funds it advanced to an individual, did that corporation sustain a bad debt loss during its fiscal year ended April 30, 1966, of $20,000 which had not been repaid to it at the end of its fiscal year. (3) Whether Arthur O. Straub received a constructive dividend during the calendar year 1965 from his wholly owned corporation, Straub Distributing Co., Inc., as a result of the distribution by the corporation of funds to an individual for whom Arthur O. Straub had previously guaranteed loans. (4) If Arthur O. Straub personally loaned the individual to whom Straub Distributing Co., Inc., distributed funds an amount of $80,000, did $20,000 of that amount constitute a worthless debt or theft loss of Arthur O. Straub for the calendar year 1965. 208 (5) Whether the payment by Arthur O. Straub of $6,000 in discharge of his obligation as guarantor of the note of an individual constituted payment of an obligation, the proceeds of which were used in the trade or business of the borrower, *289 which obligation of the borrower was worthless at the time of the payment without regard to the guarantee. (6) Did Arthur O. Straub sustain a nonbusiness bad debt loss in 1965 because of being required to pay a $3,500 note which he had guaranteed for a doctor. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner Straub Distributing Co., Inc. (hereinafter sometimes referred to as the corporation) is a corporation with its principal place of business at the time the petition in this case was filed in Orange, California. Petitioners Arthur O. Straub (hereinafter referred to as petitioner) and Cecilia P. Straub are husband and wife. They resided in Orange, California at the time their petitions in this case were filed. The Federal income tax returns of the corporation for its fiscal years ended April 30, 1965 and 1966, and the separate income tax returns of each of the individual petitioners for the calendar year 1965 were filed with the district director of internal revenue at Los Angeles, California. The individual petitioners each reported income and claimed deductions on a basis of their income and deductions constituting community property. *290 The corporation was organized under the laws of the State of California on June 30, 1959, and commenced business on or about December 1, 1959. From 1948 and until the incorporation of Straub Distributing Co., Inc., petitioner operated as a sole proprietorship the business which the corporation began to conduct. The corporation is engaged in the wholesale distribution of malt liquor as well as other products. It maintained its books and records of account on an accrual method of accounting, and used the reserve method for bad debt deductions. Petitioner has owned all of the issued and outstanding stock of the corporation since its inception. He is its president and general manager and has been at all times since the corporation commenced business. During its fiscal years ended April 30, 1965, and April 30, 1966, the corporation's gross receipts were approximately $4,400,000 and $5,200,000, respectively. In 1965 the corporation had a line of credit with the Security First National Bank, Santa Ana Branch, ranging between $100,000 and $500,000 depending upon its inventory. Petitioner became acquainted with a man named Brant H. Maynard (hereinafter referred to as Maynard) and his *291 wife Carol Lynn Maynard in 1954 at the prewedding party for petitioner's daughter. After that Maynard and petitioner often met through mutual friends. Petitioner attended lavish parties given by Maynard in his luxurious home in the Mulholland Drive area of Los Angeles Hills. Petitioner met business associates and friends of Maynard's among whom were senior army officers, bankers, and stars of the entertainment world. Maynard told petitioner of his activities in Florida as a builder and in construction work and that he was considered very successful. In late 1964 Maynard requested petitioner to guarantee a note with the Compton Branch of the Bank of America for $8,000. Maynard was attempting to acquire as part of an association an interest in a local general store in Indian Springs, Nevada. Maynard did not intend to operate the store personally. The store was located close to an Atomic Energy Commission site and a military base and had substantial business. Petitioner agreed to and did cosign the $8,000 note. On approximately February 14, 1965, petitioner received a telephone call at his office in Anaheim from Maynard. Maynard at the time was in Reno or Carson City, Nevada. Maynard *292 told petitioner that a syndicate in which he had an interest was appearing before the gaming commission of Nevada regarding a gaming license and that he had run into a personal problem of depositing with the gaming commissioner by the deadline $80,000 which amount represented his portion of the required deposit of between $150,000 to $200,000. Maynard asked if petitioner knew where funds were available or if petitioner could make him a loan or secure a loan for him to pay his portion of the deposit for the gaming business. Maynard was to be at petitioner's office the next morning. 209 After talking with Maynard, petitioner contacted Clarence E. Schuller (hereinafter referred to as Schuller), manager of the South Anaheim Branch of the Bank of America, and requested a conference the next morning concerning obtaining a loan for $80,000. Schuller was told that an officer of the Union Bank was to be at the conference. Because of the unusual circumstances of such a large loan on such short notice, Schuller made arrangements for Hal MacMillan, the bank's area administrative officer, and Jack Curran to be present for the conference. On the morning of February 15, 1965, petitioner, *293 Maynard and Larry Smalheiser (hereinafter referred to as Smalheiser) met with Schuller, MacMillan and Curran at the Anaheim Branch of the Bank of America. Smalheiser was employed by the Union Bank at its offices at Sepulveda and Ventura Boulevard in Los Angeles. At the conference it was explained that petitioner wished to borrow the money on behalf of Maynard and that the money was to be deposited in a Las Vegas bank because the gaming commission was considering an application for a casino in a new hotel in that area and the deposit was needed to secure the license. When asked for a financial statement Maynard said that he did not have one with him and could not get one before the 1 o'clock deadline for deposit of the money. Schuller was shown a telegram to the effect that because of Lincoln's birthday, a bank holiday, the financial committee of an eastern bank would not be able to act upon a request for funds in time to meet the required deadline of 1 p.m. February 15, 1965. Smalheiser referred to working through a bank in Belgium and that the refunding agent would be a Long Island Bank. Even though the loan was to be only for 24 to 48 hours, the officials of the Bank of America *294 decided not to make the loan due to the shortness of time leaving them no opportunity to check on Maynard or even to verify the need for the money. After being denied the loan by the Bank of America, Smalheiser, Maynard and petitioner conferred as to what other sources were available for a loan. Petitioner said that the only thing he knew that they could try was the Security First National Bank where the Straub Distributing Co., Inc., did its banking. Petitioner had no line of credit as an individual at the Security First National Bank (hereinafter sometimes referred to as the Security Bank). The three proceeded directly to the Security Bank and there met with an officer of the bank named Schwaiger. The parties repeated what had been said to Schuller, explaining the need of the money, the refunding agent in New York, and the critical time factor. Schwaiger said that the loan could be made if it were made to the corporation. The loan was processed immediately and the $80,000 was deposited to the account of the corporation with a draft being drawn to Maynard for $80,000 signed by petitioner as president of the corporation. Smalheiser said that proper documents should be drawn to evidence *295 the transaction. It was agreed that Maynard and his wife, Carol Lynn, would execute a note which would be placed in the mail so as to be received by petitioner by the next Monday morning. After leaving the Security Bank, petitioner, Maynard and Smalheiser went directly to the closest branch of the Union Bank, and Smalheiser placed a long distance call to the Las Vegas bank stating that the money had been secured for Maynard. This was done prior to 1 p.m. Petitioner received in the mail on an ordinary printed form, a note dated February 16, 1965, stating, "For value received I promise to pay to ARTHUR O. STRAUB and CECILIA P. STRAUB, as joint tenants or order" the sum of $80,000. The note bore no interest and was payable February 23, 1965. It was signed by Maynard and Maynard's wife. Petitioner thought that Maynard was a man of integrity. The loan to Maynard was made strictly on a personal basis because of petitioner's belief that the transaction would be of short duration. Petitioner expected that Maynard would pay the $80,000 to the Security Bank within 48 hours. When on February 23, 1965, the Security Bank had received no payment on the loan, Schwaiger contacted petitioner *296 and asked if he had received payment on the loan. Schwaiger informed petitioner that he had a wire to the effect that the Long Island Bank was not acting as a refunding agent for Maynard on the $80,000 loan. Petitioner attempted to contact Maynard at his home address, and when he failed to locate him, petitioner went to Las Vegas. Petitioner found Maynard in the casino room of the Riviera Hotel in Las Vegas. Petitioner told Maynard that no funds had arrived to pay the loan and Maynard said that he could not understand why the funds had not arrived. Maynard said that he had 210 not talked to Smalheiser, but thought that February 22nd, a bank holiday, had something to do with it. He assured petitioner that he would get in touch with Smalheiser and let petitioner know what could be done by the next morning. When petitioner told Maynard that Schwaiger had told him that the Long Island Bank was not a refunding agent, Maynard said he could not understand this, that Smalheiser was handling the matter, and that the only reason he could think of was the February 22nd bank holiday. He stated that maybe the funds would be forthcoming in a day or two. The following morning petitioner and *297 Maynard talked at breakfast. Maynard said he thought he could get part of the $80,000 for petitioner by 11 o'clock that morning but not all of it. Petitioner stated that he wanted the entire $80,000. Maynard repeated he would not be able to get the entire $80,000 but thought he could get some. Later that morning Maynard gave petitioner $30,000. Petitioner returned to Los Angeles and deposited the money which he received from Maynard into the corporation's account. Some weeks later, not having collected the full sum of $80,000 from Maynard, petitioner called on Smalheiser at the Union Bank. Smalheiser stated that the Belgian lending company had not come through and the funds were not sent into the refunding bank. Petitioner asked Smalheiser if he knew where Maynard was and Smalheiser said he did not. Smalheiser told petitioner that he would try to contact Maynard again and would do everything in his power to get the remaining moneys for petitioner. Later in 1965 when petitioner again called at the Union Bank he learned that Smalheiser was no longer employed there. About a month after the $80,000 transaction, petitioner was invited by Maynard to a party at the Aladdin Hotel which *298 he attended. Some 1,200 guests were present including a number of prominent persons whom petitioner had previously seen with Maynard and a number of celebrities. The gaming commissioner was still considering a gaming license for the Aladdin Hotel at the time, but the license had not been granted at the time of the party which petitioner believed was planned with the idea that the gambling casino would be open when the party was held. Later the gaming license was denied because of objection to some member or members of the group of potential investors. Maynard was not among those to whom there was objection. Maynard made payments on the $80,000 loan of $15,000 in April 1965 and $15,000 in May 1965, making a total of $60,000 paid on the loan. Maynard's payments were made by checks drawn on a Las Vegas bank to the order of Straub Distributing Co. In May 1965 Maynard issued another check to the corporation in the amount of $3,251.65. This was deposited to the corporation's bank account in May 1965. This check failed to clear the bank and was returned by the Security Bank in June 1965. All of the repayments by Maynard were deposited in the checking account of the corporation at the *299 Security Bank. The following is a chart showing the transactions concerning the $80,000 loan to Maynard as recorded in the corporation's books of account. Date
Description
Debit
Credit
Balance (Credit)
1965
Feb. 29
Maynard loan by draft
$80,000.00
$80,000.00
Mar. 31
Maynard loan - cash receipts
$40,000.00
40,000.00
Mar. 31
Maynard loan - Amount credited through account by bank
10,000.00
30,000.00
May 31
Maynard loan - Cash receipt
5,000.00
25,000.00
May 31
[1]Maynard loan
5,000.00
20,000.00
June 30
Maynard loan - Cash received
3,000.00
17,000.00
June 30
Maynard - N.S.F. check
3,000.00
20,000.00
1966
April 30
Charge off Maynard to bad debt
20,000.00
0
Account No. 111 of the corporation entitled, "Individuals and Companies," for the period of May 1963 through January 1967 contains the notations with respect to the transaction with Maynard. The only other entries thereon are amounts 211 less than $500 except for one entry of $2,858.86 which carries the notation (truck *300 body - to be reimbursed). The corporation had never had any business dealings with Maynard or any business with which Maynard was associated prior or subsequent to the $80,000 tansaction. For the fiscal years ending April 30, 1962 through April 30, 1968, the books and records of the corporation reflected the following: Fiscal year ending [1] April 30
Accounts and notes receivable outstanding at end of year
Sales on account (000omitted)
Addition to bad debt reserve current years provision
Bad debt charged charged off to reserve
Reserve for bad debt balance at end of year
1961
$194,915
$2,190
$ 6,786
$ 6,498
$ 9,804
1962
230,921
2,306
9,193
4,882
14,115
1963
196,367
2,617
7,422
9,535
12,002
1964
196,530
2,609 7,512
(137)
19,653
1965
267,819
3,327
14,974
7,845
26,781
1966
301,180
4,063
22,916
20,000
29,698
1967
285,920
4,409
7,504
8,610
28,592
1968
340,659
4,939
19,341
13,867
34,065
The $8,000 note of Maynard, cosigned by petitioner in 1964, was due in March 1965. This note was not paid when due and Maynard *301 told petitioner that because of being involved with the Aladdin Hotel and casino deal he had not been able to complete the Indian Springs general store transaction. Maynard asked petitioner about an extension of the $8,000 note and petitioner cosigned a 90-day extension of the $8,000 loan, the extension note being due on June 14, 1965. On June 14, 1965, Maynard paid $2,000 on the $8,000 note and petitioner cosigned Maynard's 30-day note due July 14, 1965, for the remaining $6,000. When this $6,000 note became due on July 14, 1965, the bank notified petitioner that it had not been paid. Petitioner tried to obtain payment of the note by Maynard. On August 25, 1965, Maynard had not paid this note and at the request of the Security Bank petitioner paid $6,078 for the note plus interest due and not paid by Maynard. Petitioner was informed that Maynard had acquired an interest in the general store in Nevada. Maynard became harder for petitioner to find. Petitioner went to Maynard's house in Los Angeles at one time trying to locate him and found the house padlocked and there was some Government or State "fixture" on the building. Petitioner does not know what disposition was made of the *302 house since he never followed up on that matter. In late 1965 petitioner turned over the collection of the $20,000 and the $6,078 which he had paid on the note he had guaranteed for Maynard to an attorney. This attorney was the attorney who did collection work for the corporation. On January 14, 1966, the attorney filed a suit in the names of petitioner and his wife in the Superior Court of the State of California against Maynard and his wife, Carol Lynn, for $20,000 and $8,000, alleging that the $20,000 was the unpaid amount of the $80,000 note and the $8,000 was due because of payment as a guarantor. On February 1, 1966, the defendants by their attorney filed an answer denying each and every allegation contained in plaintiffs' cause of action and stating affirmative defenses that the note in issue was obtained through duress, coercion and threats and further that plaintiffs gave defendants no consideration for the promissory note. In support of a motion for summary judgment in the suit, petitioner executed a declaration which stated: I, ARTHUR O. STRAUB, declare: I am one of the plaintiffs in the above entitled and numbered action. The other plaintiff, CECILIA P. STRAUB is *303 my wife. If I were called as a witness in this action I could competently testify to the following facts, all of which are within my personal knowledge. On or about February 16, 1965, I loaned to defendants, BRANT H. MAYNARD and CAROL LYNN MAYNARD, the sum of $80,000.00. At the time said loan was made, said defendants executed a Promissory Note, payable to myself and my wife, CECILIA P. STRAUB, in the sum of $80,000.00. A copy of said note is attached hereto, 212 marked Exhibit "A", and incorporated herein by reference. On or about February 23, 1965, the date on which said note was payable, I demanded payment from defendants. Defendants failed to pay said $80,000.00, but thereafter did pay the sum of $60,000.00, and there presently remains unpaid the sum of $20,000. On or about March 15, 1965, defendants requested an additional loan of $8,000.00. I agreed to co-sign for such a loan and accordingly, a loan for $8,000.00 was obtained from the Bank of America, and said sum was delivered to the defendants. At the time said loan was obtained declarant and defendant, BRANT H. MAYNARD, executed a Promissory Note, payable to the Bank of America in the sum of $8,000.00. A copy of *304 said note is attached hereto, marked Exhibit "B", and incorporated herein by reference. Defendants failed to pay said note when it became due, and upon demand by the Bank of America, I paid the sum of $8,000.00, principal, and $209.45, interest, the final payment being made on August 25, 1965. Declarant has demanded payment of said loan from defendants, however, they have failed to pay it and there remains unpaid the principal sum of $8,000.00. I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California on October 17, 1965. Judgment was obtained by petitioner and his wife against the Maynards on December 22, 1966. There has been no money collected on the judgment and the whereabouts of Maynard and his wife have been unknown to the corporation and to petitioner since approximately the middle of 1965. The corporation's $80,000 obligation to the Security Bank was paid to the bank at the rate of $20,000 per payment with the final payment being made on November 30, 1965. The transfer of $80,000 to Maynard was at all times carried on the books of the corporation as a loan to Maynard until the $20,000 balance was charged off as *305 a bad debt in April 1966. No criminal charges were brought against Maynard with respect to the Aladdin casino or the $80,000 transaction. Winston K. Williams (hereinafter referred to as Williams), a Doctor of Medicine and the son of a Jamaican missionary had a general practice in El Segundo. He was a member of petitioner's social set. He appeared to be a man of means. In 1965 when Williams was in his late 40's, he and petitioner had been acquainted approximately 8 years. Sometime prior to June 1965 Williams had obtained petitioner's endorsement on a $3,500 note, the proceeds of which were used by Williams to pay his income tax. This note was paid in full by Williams at maturity. Williams asked petitioner to guarantee another $3,500 note with the Bank of America. Petitioner agreed to do so and did guarantee such a note which became due on or about June 14, 1965. Williams did not have sufficient funds to pay the note so a renewal was made with petitioner again guaranteeing it. The new note was due July 14, 1965. When on July 14, 1965, the note had not been paid by Williams, petitioner was notified. Petitioner was unsuccessful in his attempt to locate Williams. The best information *306 petitioner was able to obtain was that Williams had gone back to Jamaica leaving no assets in California nor any forwarding address. Late in 1965 petitioner turned the collection of the $3,500 owed him by Williams over to an attorney. No suit was ever filed against Williams and petitioner never collected any part of the $3,500. On their separate individual income tax returns, reporting income on a community property basis, petitioner and his wife, Cecilia, each claimed a business bad debt deduction of $4,750. The combined total business bad debt of $9,500 was composed of notes paid as guarantors for the following: Brant H. Maynard
$6,000
Winston K. Williams 3,500
Total
$9,500
Respondent in his notice of deficiency disallowed to each, petitioner and his wife, these claimed deductions with the explanation that it had not been established that the deductions were allowable under any provisions of the Revenue Code. Respondent also increased the dividend income reported by each, petitioner and his wife, by $9,900 with the following explanation. It is determined that you realized dividend income, after section 116 deduction, of $18,800.00, one-half allocated *307 to you and one-half allocated to your spouse, as a result of a loan of $80,000.00 to Brant H. and Carol Lynn Maynard. You withdrew the $80,000.00 from your wholly 213 owned corporation, Straub Distributing Co., Inc., of which only $60,000.00 was repaid. The balance of $20,000.00 is held to constitute dividend income to you. Therefore, your taxable income is increased $9,900.00, computed as follows: Total dividend determined
$20,000.00
Less: Section 116 deduction 200.00
Taxable dividend
$19,800.00
Less: One-half to spouse 9,900.00
Increase in income
$ 9,900.00
Petitioner and his wife, by amendment to amended petition, each alleged that if respondent did not err in finding that petitioners received a constructive dividend of $20,000 from the corporation as a result of the loan to Maynard, then the Commissioner erred by not allowing each petitioner to deduct one-half of the $20,000 from income in the taxable year 1965 as a loss resulting from theft or embezzlement deductible in the year of discovery. Respondent in his notice of deficiency to the corporation disallowed the $22,916.10 addition to the reserve for bad debts for its fiscal year ended April 30, 1966, with *308 the explanation that the amount did not constitute a reasonable addition to reserve within the meaning of section 166 of the Internal Revenue Code or under any other section of the Code. The corporation's only contention with respect to the reasonableness of its addition to its reserve for bad debts is its contention that it properly charged off in that year $20,000 as a bad debt due from Maynard. By an amendment to its petition the corporation alleged that if it were not entitled to the $20,000 deduction as a bad debt, then it should be allowed to deduct this amount as a loss resulting from theft or embezzlement deductible in the year of discovery. Opinion The issues here are purely factual. Although the corporation at the end of its 1966 fiscal year charged its bad debt reserve with the $20,000 that remained unpaid on the indebtedness shown on its books to be due it from Maynard, its primary contention at the trial and on brief is that it sustained a theft loss in its fiscal year 1966 from the transaction with Maynard. Petitioner takes the position that if he is considered to have made the loan to Maynard, then Maynard obtained funds from him by false *309 pretenses in such a manner as to constitute a theft within the meaning of section 165(c), I.R.C. 1954. [2]
The law of jurisdiction in which the alleged theft occurred is determinative of whether a loss is a theft loss under section 165. Curtis H. Muncie, 18 T.C. 849 (1952) and Joseph M. Sperzel, 52 T.C. 329 (1969). Under the California law, Cal. Penal Code, Section 484, theft is defined as: (a) Every person * * * who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money * * * or who causes or procures others to report falsely of his wealth or mercantile character and by thus imposing upon such persons, * * * obtains possession of money * * * is guilty of theft. Section 532 of the California Penal Code defines false pretenses *310 as: Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, * * * is punishable in the same manner and to the same extent as for larceny of money or property so obtained. Petitioners argue that Maynard's representation that a bank in Long Island was to be the refunding agent for any loan made to him by petitioner or the corporation and that the loan would be repaid in from 24 to 48 hours is a material misrepresentation constituting "false pretense." [3] They state that when Maynard was told by petitioner that the Long Island bank was not acting as a refunding agent, he did not deny the statement or deny that he knew that fact and that Smalheiser did not deny that the representation as to the Long Island bank's being a refunding agent was a false representation. Petitioners contend that by failure to deny knowledge of the fact that the Long Island bank was not acting as a refunding agent, Maynard and Smalheiser should be considered to have admitted that they were guilty of false representations. *311 Petitioner testified that when he told Maynard that an officer of the Security 214 Bank had told him that the Long Island bank was not acting as refunding agent, Maynard said he "could not understand it, that Larry [Smalheiser] was handling it, and he thought the only excuse he could give was the February 22nd holiday that the banks were closed in New York as well as out here, of course, and that maybe in a day or so these funds would be forthcoming." Petitioner testified as follows as to his conversation with Smalheiser concerning the refunding agent: I told him, on the instructions of the refunding agent, Mr. Schwaiger had made the phone call and received a wire back that no such transaction took place. I said it must have been just a lie and he said, "Well, actually, you know, the Belgium lending company," I think, something about the bankers that they did not come through and the funds just weren't sent in [into] this refunding bank. And, I imagine, they are the ones that told him where the funds would come from. That is when he told me - and I wasn't familiar with Belgium banking - Schuller, manager of the Bank of America, Santa Ana Branch, testified concerning *312 the request for the loan by Maynard, petitioner, and Smalheiser: As we talked further, there was some talk about a bank in the east which was going to be making a loan to Mr. Maynard. I vaguely recall a telegram that stated because of being Lincoln's birthday, or a holiday, that the financial committee would not be able to act upon the request. I vaguely remember seeing this. This testimony falls far short of showing that either Maynard or Smalheiser "knowingly and designedly" misrepresented any fact to either petitioner or the Security Bank or had any intention to defraud petitioner or the corporation. Not only is there no other evidence in the record of fraudulent intent on the part of Maynard and Smalheiser but the evidence indicates that no intention to defraud existed. To sustain a charge of fraud by false representation or pretense, the California statute requires proof that a person "knowingly and designedly" intended to defraud another by such false representations or pretenses. The California cases point out that under the statute the intent to defraud must be shown to establish *313 the crime of theft by misrepresentation. People v. Martin, 153 Cal. 2d 275, 314 P. 2d 493, 499 (1957); People v. Ashley, 42 Cal. 2d 246, 267 P. 2d 271 (1954); and People v. Jones, 224 P. 2d 353 (1950). In People v. Ashley, supra, at 279, 282, and 283 of 267 P. 2d, the California Supreme Court stated: To support a conviction of theft for obtaining property by false pretenses, it must be shown that the defendant made a false pretense or representation with intent to defraud the owner of his property and that the owner was in fact defrauded. * * * * * * If such misrepresentations are made innocently or inadvertently, they can no more form the basis for a prosecution for obtaining property by false pretenses than can an innocent breach of contract. Whether the pretense is a false promise or a misrepresentation of fact, the defendant's intent must be proved in both instances by something more than mere proof of nonperformance or actual falsity. Cf. United States v. Ballard, 322 U.S. 78, 64 S. Ct. 882, 88 L. Ed. 1148, * * * * * * "Ordinary commercial defaults" will not be the subject of criminal prosecution, for *314 the essence of the offense of obtaining property by false pretenses is (as it has always been) the fraudulent intent of the defendant. This intent must be proved by the prosecution; a showing of nonperformance of a promise or falsity of a representation will not suffice. While a taxpayer is not required to show that the person who he contends committed a theft of his property was criminally convicted for theft, we have consistently held that to show a theft loss a taxpayer must produce evidence which indicates that the loss was by theft under the governing state law. Michele Monteleone, 34 T.C. 688 (1960). Examining all the facts we find that the petitioners have failed to establish a theft from the transactions with Maynard. In our view the evidence does not support the conclusion that Maynard and Smalheiser knew at the time they were negotiating for a loan from petitioner that the Long Island bank would not be acting as a refunding agent. However, even if we were to assume, which we do not, that Maynard knew or had reason to know at the time of the transaction with petitioner *315 that there would be no refunding agent in the East, we have no basis from the evidence in this record for concluding that he made a misrepresentation in respect to the 215 refunding agent with the intent to defraud petitioner. On or about February 24, 1965, 10 days after the loan, Maynard paid petitioner $30,000 on the debt. By the first of June Maynard had paid a total of $60,000 to petitioner, leaving only $20,000 unpaid. In our view this evidence indicates an intent on the part of Maynard to repay the loan, not an intent to defraud. We hold that neither petitioner nor the corporation suffered a theft loss in connection with their transactions with Maynard. Petitioners contend that if the transaction with Maynard did not result in a theft loss, then the corporation properly charged off the $20,000 against its reserve for bad debts in its fiscal year 1966 and therefore respondent erred in disallowing its addition to its reserve for that year. Petitioners do not contend that the corporation's bad debt reserve was not sufficient to require no addition at the close of its fiscal year 1966, if it improperly charged the $20,000 against its reserve. Respondent contends that the *316 corporation improperly charged the $20,000 against this reserve since in substance the corporation made no loan to Maynard. Respondent contends that the corporation paid a constructive dividend of $80,000 to petitioner and that petitioner from this constructive dividend lent Maynard $80,000 but that later petitioner returned $60,000 of the constructive dividend to the corporation. Respondent further contends that if the corporation did make the loan to Maynard, it has failed to show that the resulting debt became worthless in its fiscal year 1966. In our view of the facts, for the reasons hereinafter stated, the substance of the transaction between the corporation, petitioner, and Maynard was that the corporation lent petitioner $80,000 which petitioner lent to Maynard. Neither Maynard nor any business with which he was associated had ever done any business with the corporation. Petitioner met Maynard socially and for a number of years prior to 1965 petitioner and Maynard had seen each other socially. Petitioner attended lavish parties given by Maynard at his home. The first indication the record shows of any transaction other than social meetings between petitioner and Maynard was *317 toward the end of 1964 when petitioner guaranteed a note of Maynard's for $8,000 which sum Maynard stated he wanted to invest in a general store in Indian Springs, Nevada. This transaction was on the basis of the social and personal relationship between petitioner and Maynard. There is no indication in the record of any business benefit which was to result to petitioner from this transaction. In February 1965 Maynard asked petitioner personally to assist him in obtaining financing. Maynard asked petitioner to lend him $80,000 or to help him to secure the $80,000 elsewhere. Petitioner and Maynard went to the Bank of America where petitioner did his personal banking and requested an $80,000 loan in petitioner's name with the official of the bank being informed that the funds were to be turned over to Maynard. The officials of the Bank of America refused the loan because the shortness of time would not allow them to check on Maynard or even to verify the intended use of the loan. After the Bank of America refused to make the loan, petitioner, Maynard, and Maynard's bank advisor from the Union Bank, Smalheiser, discussed other possible sources for a loan for Maynard. Petitioner suggested *318 that they might try the bank where his wholly owned corporation did its banking. The three men proceeded to the Security Bank, where the corporation had a line of credit of between $100,000 and $500,000. Petitioner, Maynard, and Smalheiser requested a loan of money for Maynard's use from the Security Bank. The official of that bank agreed to loan the $80,000 if the loan were made to the corporation. Because petitioner owned all of the stock of the corporation and was its general manager, he was able to obligate the corporation on the loan without consulting others. At the suggestion of the officials of the Security Bank, Maynard and Smalheiser agreed that proper evidence of the loan should be executed. Maynard and his wife executed a note for $80,000 dated February 16, 1965, payable February 23, 1965, to petitioner and his wife, Cecilia, as joint tenants. The rate of interest listed on the loan was "None." Petitioner did not endorse the note to the corporation or request that the payee of the note be changed to the corporation. A few months later when Maynard failed to pay the $20,000 balance on the loan, petitioner and his wife filed suit in the Superior Court of the State of California *319 for the County of Los Angeles. In support of a motion for summary judgment petitioner executed a declaration in which he stated: 216 On or about February 16, 1965, I loaned to defendants, BRANT H. MAYNARD and CAROL LYNN MAYNARD, the sum of $80,000.00. At the time said loan was made, said defendants executed a Promissory Note, payable to myself and my wife, CECILIA P. STRAUB, in the sum of $80,000.00. * * * He further declared, "I declare under penalty of perjury that the foregoing is true and correct." There is some indication from the Maynard loan account on the corporation's books that initially petitioner paid more to the corporation on the "Maynard" loan than he received from Maynard and later in some way this was adjusted to show payment to the corporation equal to the payments made on the loan by Maynard. Since petitioner and not the corporation lent Maynard the $80,000, any addition to the corporation's bad debt reserve for the fiscal year ended April 30, 1966, based on the unpaid portion of the Maynard loan is not justified. The corporation admits that except to the extent it properly charged a part of the Maynard loan to its bad debt reserve, respondent properly *320 disallowed any additions to reserve for its fiscal year ended April 30, 1966. We sustain respondent's disallowance of the corporation's addition to its bad debt reserve. Section 316[4] defines a dividend as any distribution of property made by a corporation to its shareholders out of its accumulated or current earnings and profits. *321 Section 301 [5] provides that a distribution of property by a corporation to a shareholder with respect to its stock be treated as a dividend. Respondent contends that when the corporation distributed $80,000 to petitioner for petitioner to lend to Maynard, the corporation in effect declared a dividend to petitioner. Respondent determined the amount of the dividend received by petitioner to be $20,000 apparently on the basis that petitioner returned $60,000 of the $80,000 to the corporation during the year 1965, the same year in which respondent contends that petitioner received the benefit of the $80,000 from the corporation. Respondent relies on *322 Sachs v. Commissioner, 277 F. 2d 879 (C.A. 8, 1960), affirming 32 T.C. 815 (1959). The Sachs case involved a payment made by a corporation for a stockholder's benefit under circumstances which indicated that there was no expectation that the stockholder would repay the corporation. In the instant case the $80,000 was transferred to Maynard with the expectation that the corporation would be repaid. Therefore, in our view the corporation in 1965 made a loan to petitioner. The evidence is clear that petitioner intended to repay the corporation as payment was received from Maynard. By August Maynard had repaid all but $20,000 of the loan and petitioner had repaid an equal amount to the corporation. The clear indication from the record is that as of the end of 1965 petitioner intended to repay the final $20,000 to the corporation if and when he collected that amount from Maynard. At the end of 1965 petitioner was still attempting to collect the $20,000 and in fact shortly after the close of the year instituted a suit looking toward that end. Our conclusion from the record as hereinafter discussed in more detail is that as of the end of 1965 there was a reasonable *323 probability that petitioner would collect the final $20,000 from Maynard and that the $20,000 would be 217 repaid to the corporation. We therefore hold that petitioner received no dividend from the corporation in 1965 but at the end of that year had an outstanding indebtedness to the corporation of $20,000 which he intended to repay. Whether at some later date there might result a dividend to petitioner from the cancellation by the corporation of his indebtedness to it, we need not decide since the only year of petitioner and his wife before us is the calendar year 1965. See Grant R. Bishop, 55 T.C. - (Feb. 3, 1971). Petitioner contends that if he is considered to have lent Maynard the $80,000, then he should be held to have sustained a bad debt loss of $20,000 from the transaction in 1965. Petitioner does not specify whether he contends the $20,000 bad debt loss to be a business or nonbusiness bad debt. However, petitioner contends that he had a bad debt loss in 1965 because of being required to pay the $6,000 note which he had guaranteed for Maynard, and he contends that this loss is to be treated as a business bad debt loss under section 166(f). [6]
*324 We do not reach the question of whether the $6,000 payment by petitioner as guarantor of Maynard's note would otherwise qualify under section 166(f) since we conclude that petitioner has failed to show that this debt was worthless at the time he made the payment to the bank or at any time during 1965. We likewise conclude, based on the same facts in the record, that petitioner has failed to show that the $20,000 debt of Maynard was worthless in 1965. The record shows that toward the end of 1965 petitioner turned over the collection of these two debts to an attorney who had also done collection work for the corporation. Shortly after the end of the year 1965 this attorney instituted suit against Maynard on behalf of petitioner. This fact alone is some indication that the debt of Maynard had some value throughout the year 1965. However, the record contains other substantial evidence indicating to this effect and no evidence to support petitioner's contention that the indebtednesses of Maynard were worthless at the end of 1965 except the fact that sometime around the middle of 1965 petitioner personally and the "corporation" which obviously would be the officer of the corporation, did *325 not know the whereabouts of Maynard. As will be hereinafter pointed out, it would appear from all of the evidence that petitioner, through his attorney, could very likely have ascertained Maynard's whereabouts for himself and the corporation. Maynard was apparently a man of wealth. He apparently owned a large home in an area of expensive property in Los Angeles Hills and had many business dealings in Florida and Nevada. While petitioner did not know where Maynard was after about August of 1965, he filed a suit against him in early 1966 which was answered in February 1966. Even though the suit was answered by an attorney for Maynard, the indication is that Maynard was served with the complaint. The suit resulted in petitioner's obtaining a judgment in December 1966 against Maynard for the $20,000 and $6,000 debts. Nothing has been collected on the judgment. However, the record does not show what efforts were made to collect the judgment. The indication from the record is that Maynard did acquire an interest in a store at Indian Springs, Nevada and there is no showing that something might not have been collected on the judgment from this source or from the home owned by Maynard. The *326 evidence shows that petitioner found the home padlocked when he went by in the latter part of 1965 and that some State or Federal liens had been placed on it. However, there is no showing of the value of the home above such lien or that petitioner attempted to collect on the judgment he obtained from that source or that at the end of 1965 shortly before the suit was instituted, this home was not a probable source of collecting the debt after judgment was obtained. Petitioner relies on a number of cases in which a taxpayer was held to have shown a debt to be worthless when the whereabouts of the debtor were unknown and the debtor was shown to have no property out of which the debt could be satisfied. In this case the debtor is shown to have had several properties out of which petitioner might have collected all or part of the $20,000 and $6,000 debts. On that basis 218 of the facts, we conclude that petitioner has not established that the debts owed him by Maynard were worthless in the year 1965. The final issue is whether the $3,500 debt owed by Williams to petitioner became worthless in 1965. Petitioner concedes that this debt is neither a business bad debt nor a debt to which *327 section 166(f) is applicable. Williams disappeared about the middle of 1965. Petitioner unsuccessfully attempted to locate Williams. The information which petitioner received was that Williams was in Jamaica where he had spent his childhood. Petitioner could locate no assets left by Williams in this country. The only source of income which Williams appeared to have was from his general practice of medicine in El Segundo, California. Since Williams disappeared in 1965 under circumstances that indicate he had left the country without leaving property from which petitioner could receive repayment on his debt, we find that the debt of $3,500 owed to petitioner by Williams was a nonbusiness bad debt under section 166(d) which became worthless in 1965. Nathan H. Gordon Corporation, 2 T.C. 571, 584 (1943). Petitioner is, therefore, entitled to treat the $3,500 as a short-term capital loss in computing his income tax for the year 1965. Decision will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Arthur O. Straub, Docket No. 4295-68, and Cecilia P. Straub, Docketno. 5204-68.↩
1. "To correct information given us in April to the effect that a $5,000 check had been N.S.F. as the check cleared the bank."↩
1. Straub Distributing Co., Inc., commenced operation as a corporation on December 1, 1959.↩
2. All references are to the Internal Revenue Code of 1954.↩
3. While the parties disagree as to whether the loan to Maynard was from the corporation or from petitioner, they rely, of course, for their theft loss argument on the representations made to petitioner whether in his personal capacity or as president of the corporation. Therefore, in this discussion we will refer to the loan without determining whether it was from petitioner or the corporation, an issue we reach later.↩
4. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.↩
5. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General. - Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable. - In the case of a distribution to which subsection (a) applies - (1) Amount constituting dividend. - That portion of the distribution which is a dividend (as defined in section 316↩) shall be included in gross income.
6. Sec. 166(f)↩ Guarantor of Certain Noncorporate Obligations. - A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.